[No. 13083.  Department Two.  February 4, 1916.]

THE STATE OF WASHINGTON, *Appellant*, v.
ALEC TOWESSNUTE, *Respondent*.[1]

INDIANS—RIGHTS AND TITLE TO SOIL—EFFECT OF TREATY. The prior occupancy of American soil by the Indian tribes did not vest them with sovereignty or any title to the land that was ever recognized by the white race, the Indian being merely an occupant with possessory uses for subsistence, and a favored ward of the Federal government.

SAME. The fact of Indian sovereignty and title to the land is not admitted by a document called a "treaty" with the tribe as a "nation" in prior possession, in terms which "concede," "convey," and "relinquish," rights to the Federal government.

SAME—INDIAN TREATY—CONSTRUCTION. An Indian treaty, interpreted as a provision from a guardian of the tribe, should be construed toward benevolence to the Indians, but with due regard to the rights of the whites.

SAME—INDIAN TREATY—RIGHT TO FISH OUTSIDE RESERVATION—EASEMENT—STATE REGULATIONS. The Indian treaty of 1859 (12 Stat. at L. 951) securing to the Yakimas the exclusive right of taking fish in all the streams running through or bordering upon the reservation, and "also the right of taking fish at all usual and accustomed places in common with citizens of the territory," merely grants an easement for ancient fishing places outside the reservation, in common with the whites, upon equal terms, subject to state regulation and laws requiring a fishing license.

CONSTITUTIONAL LAW—POLICE POWER—CONSERVATION OF FISH. The police power is not confined to subjects of safety, but extends to those of convenience and prosperity, including the conservation of fish.

INDIANS—INDIAN TREATIES—CONSTITUTIONAL LAW—POLICE POWERS. An Indian treaty will be held impliedly repealed by the act admitting

[1]Reported in 154 Pac. 805.

a state to the Union, rather than that the state be crippled in its police power.

INDIANS—INDIAN TREATIES—STATES—ADMISSION. An Indian treaty respecting fishing rights in a territory cannot impair the power of Congress to admit the territory to statehood upon terms of sovereignty equal to that of the other states.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for Benton county, Linn, J., entered June 10, 1915, upon sustaining a demurrer to the informations, dismissing consolidated actions for the violations of laws relating to the taking of fish. Reversed.

*The Attorney General, C. W. Fristoe,* and *L. L. Thompson,* for appellant.

*Francis A. Garrecht,* for respondent.

BAUSMAN, J.—It is conceded, by stipulation and in argument, that the Indian, Towessnute, tribal inhabitant of the Yakima Indian reservation, has committed violations of our fishing statutes on the Yakima river, not only several miles outside of the reservation, but at a spot in no way appurtenant to it by path or easement. It is also conceded that, if his tribe may continue to do these things, the salmon industry of this state must be grievously wounded in its very nurseries, because the Yakimas and other tribes, whose contentions in cases now pending are the same, claim many such spots on various waters to be exempt from these statutes, and because these people, once savage and wandering, have become settled in their modes of life and frequently pursue fishing for a profit. The habits of salmon in seeking at certain seasons the highest fountains of our streams to spawn in are well known, and such is their persistence and thronging at the entrance to them and at either rapids or dams that the state has found it imperative to save them at such places by regulations.

These considerations, together with what we conceive to be a misunderstanding of certain Federal decisions, make it best to discuss this case somewhat at length. Inconvenience or loss to ourselves, however great, is no ground, indeed, for taking away any rights that the Indians may actually possess; but is proper to be considered, in deciding from a dubious document, whether Congress, looking to the future of this commonwealth, ever intended to bestow them.

What Towessnute did contrary to the statute was to fish without a license, snag salmon with a gaff hook, and catch fish without hook or line within a mile of the dam. These acts constitute, for the purpose of this discussion, one offense, since all were committed at one place where Indian privileges are asserted to justify them. Towessnute's defense is that his manner of fishing was ancient in his tribe and the spot an immemorial resort where he required no license. The lower court justified him under the Yakima treaty of March, 1859 (12 Stat. at Large, 951), which was passed after Washington had been made a territory with legislative power over "all rightful subjects of legislation," and which, after creating a reservation whither the Yakimas should retire, provided:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

The reasoning was that the words "in common with" would be unduly stretched if the Indians were to be subjected, even at a fishing resort beyond the reservation, to state regulation. All that he lost by that phrase, it was contended, was that the white man might fish there too. Within the res-

ervation, only the Indian might fish; outside, both; the
former in his old way, the white man as the state 'should
prescribe. To express the argument concisely, the Indian,
as a sovereign, merely yielded a partnership. The .old loca-
tions were his before the treaties; by that convention he ad-
mitted the white man, but the white man got only what the
Indian clearly conceded. In terms, indeed, the treaty, men-
tioning nothing of the manner of fishing, secured to the In-
dian only the place. But it was not necessary to secure the
manner also in express terms. Not surrendered, it was re-
tained. In support of this argument, counsel point to the
priority of the Indian's possession; to the fact that the doc-
ument is called a treaty; that this treaty deals with the
Yakimas as a "nation;" and that the words on the Indian
side are "concede," "convey," and "relinquish." In short,
the Yakimas kept the reservation and- ceded the outside
places on their own terms.

The premise of Indian sovereignty we reject. The treaty
is not to be interpreted in that light. At no time did our an-
cestors in getting title to this continent ever regard the
aborigines as other than mere occupants, and incompetent
occupants, of the soil. Any title that could be had from
them was always disdained. From France, from Spain, from
Mexico, and from England we have ever proclaimed our
title by purchase, by conquest, and by cession, in all of
which great transactions the migratory occupant was ig-
nored. Only that title was esteemed which came from white
men, and the rights of these have always been ascribed by
the highest authority to lawful discovery of lands, occupied,
to be sure, but not owned by any one before. *Johnson v.
McIntosh*, 8 Wheat. 543. If in *Worcester v. Georgia*, 6 Pet.
515, the supreme court speaks of the Indians having some-
thing which the whites had yet to purchase, it was not title,
but mere possessory uses for subsistence. Later cases con-
tinue to plant our title on discovery. *Martin v. Waddell*,

16—89 WASH.

16 Pet. 367, 409; *United States v. Rogers,* 4 How. 567, 572.

The Indian was a child, and a dangerous child, of nature, to be both protected and restrained. In his nomadic life he was to be left, so long as civilization did not demand his region. When it did demand that region, he was to be allotted a more confined area with permanent subsistence. True, arrangements took the form of treaty and of terms like "cede," "relinquish," "reserve." But never were these agreements between equals. Even when we dealt with a "nation" the Indians were not "within the description . . . of an independent state or sovereign nation, but of an Indian tribe . . . wards of the nation . . . communities dependent on the United States . . . the recognized relation . . . that between a superior and an inferior." *Choctaw Nation v. United States,* 119 U. S. 1, 27.

These arrangements were but the announcement of our benevolence which, notwithstanding our frequent frailties, has been continuously displayed. Neither Rome nor sagacious Britain ever dealt more liberally with their subject races than we with these savage tribes, whom it was generally tempting and always easy to destroy and whom we have so often permitted to squander vast areas of fertile land before our eyes.

The treaty, then, interpreted as provision from the great guardian of this tribe, should be construed toward benevolence, and even be bent somewhat toward the Indian's notion of his rights. On the other hand, the children of the donor are not to be ignored. The whites, too, were to enjoy, and enjoy by right, the waters and the soil. The document must be read from that point of view as well.

But suppose in it a purpose solely of protecting the Indian, we must here first inquire what was particularly aimed at in allowing him these outside resorts of fishery, when the reservation itself is watered by the Yakima and other streams. It could not have been to insure the Indian's existence. It certainly was not done out of a fear that he would not find

within the reservation sufficient food.  For if that was in the mind of the donor or of the Indian, why was the white man allowed to share these resorts?  Nothing could be plainer than that the numbers of the white fishers, their advancing population, and their encroaching towns and mills would speedily render the reserved fishing spot worthless. Accordingly, those who deem these locations of vital importance to the Indian must surely wonder why Congress failed to state in positive words that these resorts too were to remain exclusively the Indian's.  Why were they not declared inviolate on both banks of all the streams and forever?

Not only was this not said, but there is inserted the words "in common with citizens of the territory."  Such as argue that the Indians relied on either the literal words or the general spirit of this treaty must acknowledge that this expression is perfectly plain; that the Indian expressly admitted the white man to these locations, and that he did not deem it indispensable to keep the white man off them altogether.  It must be assumed that the Indians understood this simple phrase.  In our opinion, they did understand it and did not object to it; but, since it is asserted to be historically true that there was great discontent among the Yakimas concerning this treaty, and that some of their chiefs refused to sign it, it is possible that they understood this privilege as we understand it, and that this feature was one of the things not acceptable to them.

As for Congress and the intent of that body, it was not unaware that Indians when off the reservation have ever been subject to the criminal laws of the states and territories; that the police power is indispensable to any commonwealth, and that the right of regulating fish and game is a proper exertion of such a right.  *Geer v. Connecticut*, 161 U. S. 519; *State v. Tice*, 69 Wash. 403, 125 Pac. 168, 41 L. R. A. (N. S.) 469; *Sligh v. Kirkwood*, 237 U. S. 52.

Was it, then, intended that the Yakimas, at ancient places of fishing outside of their reservation, were forever to fish as

they pleased and when they pleased, ignoring the regula-
tions of the future commonwealth for the preservation of
what would keep such a place useful to both parties in in-
terest? Surely it is not fretful to suppose that the treaty
gave to the Indians the exclusive part of their privileges in
the reservation and that nothing better than equality with
the white man was given outside of it. Let us consider the
situation at that time. The Indian already saw the ap-
proaching end of his rovings, already felt it best to get an
area that should be his alone. His hunting ground already
narrowed by the settlements, he was really giving up little.
By the treaty he was gaining an exclusive domain of eight
hundred thousand acres, immunity from intrusion by the
white man, freedom from local laws, either civil or criminal,
and perpetual existence in a valley both fair and ample. In
return we must suppose that he was to give up everything
outside of it. Whatever he could retain outside by this ne-
gotiation was, so to speak, so much added to the bargain.

The main purpose of the government was to separate the
Indian from the white man and to care for the Indian in a
district more confined. Yet it was natural to indulge him
with the right of hunting on the outside public lands whilst
these remained unsold and to let him fish at his old resorts
outside. But at these last he should have no advantage over
the white man. The title to the spot should not be the In-
dian's—only an easement. The two races should fish in com-
mon. The territory, in general, was to be the white man's,
and he could even acquire absolute title, but he was to let
the Indian fish; and that he might not, by crafty statute,
subsequently cut off the Indian's privilege at these places, a
positive easement was impressed upon the land. Then were
inserted the words "in common with citizens." These words
were not used to give something to the white man, but to
give something to the red man; not to give the Indian an
advantage, but to save him from disadvantage. Such, in
our opinion, is their true intent. They are an eternal guar-

anty that at these spots the Indian shall have equal, but not more than equal, rights. The fishing grounds remain for both races without advantage to either. The white man's laws may operate on the enjoyment of the right, but must operate on both races alike, and the Indian, since the lands were to be sold to settlers, should be sure of access to the water by an easement.

To adopt the other construction is not only to ignore a simple phrase and give the Indian an advantage, but is to suppose that Congress designedly crippled the government of a future state in powers salutary and essential. The police power is not confined to subjects of safety, but extends to those of convenience and prosperity. *Chicago, B. & Q. R. Co. v. Drainage Com'rs*, 200 U. S. 561, 592. It undoubtedly extends to the conservation of fish. *Smith v. Maryland*, 18 How. 71. Nor is it given up, nor can it be given up, by any legislature to the national government. It must be exerted, to be sure, in such manner as will not infringe other rights which the states, by the constitution, gave up to the central authority; but in controversies on this point the Federal decisions clearly resolve every doubt in favor of the local law. Indeed, even on a subject within the exclusive rights of the general government, the state laws of police will be upheld until the Federal law has actually been extended to that subject. *Sligh v. Kirkwood, supra.*

It can hardly be imagined, then, that the easement was to be forever exempt from that local sovereignty which, in the promotion of mere prosperity, has compelled a railway company to rebuild, at its own great expense, a lawfully constructed bridge in order that tracts below might be rendered not healthful but more salable and tillable; which has compelled farmers to suffer without compensation floods that were caused by the government's damming the stream; which has cut off old and valuable landing places, by an artificial shifting of a river, without compensation to the riparian owner; which has rendered a dock useless and lost to the

owner while the public tediously builds a tunnel. (See the cases collected in *Chicago, B. & Q. R. Co. v. Drainage Com'rs, supra.*)

But, it will be said, the local government may so legislate that, at the place of easement, there can be no fishing in future at all. Replying to this, it is plain that the white man must in that event equally lose. In the second place, the police power, when, exerted not for public health or safety but for prosperity, it encounters vested rights, may become unlawful by excessive degree, so it will be time enough to discuss such a situation when it arises. On the one hand, an owner cannot remove his property from the police power by making a contract concerning it. On the other hand, the state, under the police power, cannot commit a confiscation. Thus it is properly instanced that, while a city may lawfully restrict the height of buildings, it must not restrict to such a degree as renders the land entirely useless. *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 355.

It is a peculiarity of almost every legal principle that, enforced to an extreme, it changes its character; and as both time and the circumstances must be considered in deciding whether an exertion of police power is really gnawing a constitutional right, it is not improbable that what might have been reckoned a needless or excessive exertion of it over these Indian rights in the early days of 1859, might be adjudged a proper one in 1915 by reason of the vast changes in the white population and the altered manners of the Indians. As much undoubtedly was conceded by the Federal supreme court in respect to the exclusive power of Congress to prohibit the alcohol traffic with the Indians in a case in which it was argued that a state's criminal jurisdiction would be unfairly cramped by such Federal law, the court, while upholding that statute, remarking as to a future situation in which the Indians might greatly diminish and become scattered through the state:

"A prohibition valid in the beginning doubtless would become inoperative when in regular course the Indians affected were completely emancipated from Federal control. A different view in either case would involve an unjustifiable encroachment upon a power obviously residing in the state." *Perrin v. United States*, 232 U. S. 478, 486.

If it be argued that the rights of this commonwealth while a territory were less than those of a state and that the police power was then at the mercy of Congress, we must remember that the supreme Federal tribunal has held Congress itself incompetent to cut off this power from a future state. Long after one of these Indian treaties, Congress, by an act admitting a state to the Union on equal terms with its sisters, was adjudged to have revoked, and to have had the right to revoke, whatever in the treaty itself may have impaired the police power. *Ward v. Race Horse*, 163 U. S. 504. There it was held that the act admitting Wyoming was superior to a treaty with the Bannock Indians, in so far as the latter were by that treaty eternally privileged to hunt as they pleased on unoccupied Federal land, since so extensive, numerous, and scattered were the unsold lands that Wyoming would practically be deprived of her police power in respect to game and would enter the Union no equal sister.

In *Coyle v. Smith*, 221 U. S. 559, Oklahoma was relieved of a feature of its admission act that attempted to fix the location of its capital city. Congress, it was held, had no power to admit states under conditions unequal in these respects.

The first decision establishes a repeal of an Indian treaty even by implication rather than that a state be crippled in its police power. The other decision maintains the insufficiency of any act of Congress, even when designed to such an end, to impair the equal sovereignty of the state that it was then creating.

Nor is *United States v. Winans*, 198 U. S. 371, in conflict with these views, though under this same Yakima treaty it

sustains the tribe in an ancient fishing place on another river, the Columbia. Nothing can be clearer than that what was there involved was a white settler's attempt to ignore the Indian's easement. The adjoining land had passed from the general government to a white owner, who, the court properly held, was making it impossible for the Indian to enjoy his privilege. What the case decided was that the government grantee had bought the land with that easement on it, and even from this commonwealth the grantee could not get something additional that would impair that easement. As for the police power, it was neither involved nor discussed in that case, so it is little in point to remark that the act admitting this state to the Union was also held not to have affected the easement derived by the treaty. The court was careful to be understood as sustaining a mere easement. That it might not put the privilege above the police power, it says of the easement at page 384:

"Nor does it restrain the state unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enables the right to be exercised."

*Winters v. United States*, 207 U. S. 564, is as easily distinguished, for what that decided was that the enabling act of Montana did not give water appropriators rights superior to appropriations made by government officials on an Indian reservation for the benefit of that reservation, when the appropriations were made before statehood. The equal footing right of Montana when entering the Union was clearly not impaired.

Neither do we find contrary authority in such cases as *United States v. Sandoval*, 231 U. S. 28; *Ex parte Webb*, 225 U. S. 663; *Dick v. United States*, 208 U. S. 340. What these and several other similar cases hold is that the acts admitting territories into statehood do not prevent the general government's continuing to protect Indians by its own laws, and beyond the bounds of the reservation, from persons who seek to sell them alcohol. The new state's equal

footing is not diminished by such enactments or by the continuation of such authority, for the tribal Indian is a ward of the general government under the clause of the Federal constitution to which the states expressly consent, and such ward he remains wherever he may be.

The judgment is reversed, with instructions that the case be reinstated and that the demurrer to the information be overruled.

MORRIS, C. J., MAIN, and PARKER, JJ., concur.

HOLCOMB, J. (dissenting)—Whatever may be the views of the majority as to what an Indian treaty with our national government is—whether it is a treaty between two sovereigns or not—it is certainly a solemn compact binding in law and in honor upon both parties to it.

The majority in this case treat this compact as one that the national government through Congress rightfully could, either expressly or by implication, set aside at will without the consent of the other party, the Indian tribe, and that it did so by implication by force of the enabling act authorizing the formation of the territory of Washington into a state.

I cannot concur therewith. Good faith requires the observance of the spirit as well as the letter of the compact with the Indians, more especially because the Indian tribe is the weaker of the two parties to the compact. In doubtful questions the doubt has most generally been resolved in favor of the Indian tribes.

The stress laid upon that phrase in the clause of the treaty under consideration, "the right of taking fish at all usual and accustomed places, *in common with citizens of the territory*," is a strained construction. Had the phrase been "upon the same terms" in place of "in common with" the citizens of the territory, the construction would have been just. At the time of the treaty it was not known, possibly not even surmised, that the future state would rigidly regulate and partially prohibit the fishing in its streams; that

certain fishing apparatus would be prohibited; the number or quantity of fish taken limited; the fishing season limited, and license required to fish at all.

It is undoubted that the state can assume and assert its police power over game and fish for their protection and conservation. But that sovereign power is subject to a still more supreme power—that of the Federal government when exercising its lawful jurisdiction. In some fields of government, the state is supreme; in others, the nation. I am as jealous of the proper restriction of each as any one. In the exercise of its lawful power over a matter of which it had supreme and exclusive jurisdiction, the nation made a compact with the Yakima tribe of Indians, whereby the Yakima tribe "relinquished and ceded" to the United States its rights or claims, whichever term may be preferred, to certain territory, in return for which the United States granted to the Yakima tribe a certain area of land together with certain immutable rights outside thereof.

The view of the majority is exactly that of the district judge in *United States v. Winans*, who, concerning this same treaty and the same clause, said:

"The Indians are at the present time on an equal footing with the citizens of the United States who have not acquired proprietary rights, and this it seems to me is all that they can legally demand with respect to fishing privileges in waters outside the limits of Indian reservations under the terms of their treaty with the United States."

That view was disapproved by the Federal supreme court in language rather testy and ironical. The case was appealed and the lower court was reversed by the supreme court, the decision being reported in 198 U. S. 371. The opinion stated the issue as above summarized, and further made these observations:

"In other words, it was decided that the Indians acquired no rights but what any inhabitant of the Territory or State would have. *Indeed, acquired no rights but such as they*

*would have without the treaty.* [Italics mine.] This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more. And we have said we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' 119 U. S. 1; 175 U. S. 1. . . . There was a right outside of those boundaries [of the reservation] reserved 'in common with citizens of the Territory.' As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. . . . *And the right was intended to be continuing against the United States and its grantees as well as against the state and its grantees.* [Italics mine.]"

To my mind, by this construction, the rights of the appellant in question are as plainly and emphatically determined as if the decision were in the present case. It is conclusive of this controversy and binding in law upon this court. We have no option whatever but to construe this treaty right, as has the supreme court of the United States concerning the same treaty.

Furthermore, if the state can regulate the fishing of the Indians under the guise of police power, it can prohibit, and that in the face of the treaty, for regulation is a part of the power to prohibit and the one but a step toward the other. If the state should prohibit citizens of the state from fishing in any manner upon these streams in question, it would either be compelled to except Yakima Indians not citizens because of the treaty, or include them in the general effect of the law, and thus abrogate the treaty as to those rights—a thing the state cannot do.

I therefore dissent.