[No. 22519. Department One. December 29, 1930.]

PIONEER PACKING COMPANY, *Respondent*, v. JACK WINSLOW, *Appellant.*[1]

[1]Reported in 294 Pac. 557.

656

*The Attorney General* and *V. D. Bradeson,* for appellant.

*John C. Hogan* and *Theo. B. Bruener,* for respondent.

*Stuart H. Elliott* and *H. G. & Dix H. Rowland, amici curiae.*

MAIN, J.—This action was brought for the purpose of restraining the county game warden of Grays Harbor county from interfering with the right of the plaintiff to buy game fish, namely, steelhead, on the Quinault Indian reservation, and ship them out of the state. The trial was to the court without a jury, and resulted in a judgment sustaining the claimed right to injunctive relief, from which the defendant appeals.

The material facts are not in substantial dispute, and may be stated as follows: The respondent, Pioneer Packing Company, is a corporation, with its principal place of business in Aberdeen, where it is engaged in buying and selling fish. The New England Fish Company is a corporation, with its principal place of business in New York City, where it is a dealer in fish. During the month of December, 1929, the respondent purchased from the Quinault Indians on their reservation, and had in its possession, about 1,724 pounds of steelhead salmon, or fourteen boxes, which fish were caught by the Quinault Indians in the Quinault river, which flows across the Quinault Indian reservation. The fish were placed in the boxes and iced on the reservation. The boxes were there stenciled on the outside with the address of the New Eng-

land Fish Company, New York City. The fish were then turned over to the Star Transfer Company, which hauled them from Tahola on the reservation to the express company's office in the city of Aberdeen, a distance of something like forty or fifty miles, for shipment to New York City. The respondent paid the transfer company for the hauling of the fish from Tahola to Aberdeen. When the transfer company delivered the fish to the express company, it received a receipt therefor. The waybills which accompanied the fish to New York were made out at the express office at Aberdeen. While the fish were at the express office, they were seized by the county game commissioner of Grays Harbor county, because, at the time, under the law of this state, it was unlawful to have steelhead in one's possession for the purpose of shipping them out of the state.

■ ■ The first question is whether the Indians have title to the fish in the river on the reservation, or whether the title thereto is in the state in trust for the benefit of all the people thereof, with merely a license on the part of the Indians to catch them.

The respondent contends that the title to the fish is in the Indians, and the appellant contends that they had merely a license to fish. To determine this question requires an examination of the treaty made with the Quinault Indian tribe by which they ceded their lands to the United States with a reservation to be set off to them by proclamation of the President of the United States. This treaty was entered into by the United States and the Quinault Indian tribe July 1, 1855 (12 St. L. 971), which treaty was ratified by the Senate of the United States March 8, 1859. By the treaty the Indians "ceded" to the United States a vast territory, including nearly one hundred miles of Pacific coast, extending approximately from a few miles

south of Cape Flattery to a few miles north of Grays harbor, and extending back from the shores of the Pacific ocean forty miles or more to the center of the coast range of mountains. By the treaty the Indians "reserved" a sufficient area for their wants, to be selected by the President of the United States, as stated. In accordance with the provisions of the treaty, the President of the United States, on November 7, 1873, promulgated an executive order by which the present Quinault Indian reservation was

". . . withdrawn from sale and set apart for the use of the Quinaielt, Quillehute, Hoh, Quit and other tribes of fish-eating Indians on the Pacific coast."

Section 1 of the treaty provides that the Indians

". . . hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied by them, bounded and described as follows: . . ."

Section 2 provides that there shall be

". . . reserved, for the use and occupation of the tribes and bands aforesaid, a tract or tracts of land sufficient for their wants within the Territory of Washington, to be selected by the President of the United States, and hereafter surveyed or located and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent. . . ."

By these sections of the treaty, there was the ceding of a larger tract of land, all then owned by the Indian tribes, with a reservation of lands out of the larger area to be set aside by an executive proclamation.

The Federal courts have held that, where there is a ceding and reservation under a treaty of this kind, the Indians own the land subsequently designated in the executive order in the same title and with the same right as they previously owned the entire area ceded.

In *Gaines v. Nicholson,* 50 U. S. 356, it was held that, where there were reservations in Indian treaties of specific tracts of land, which were afterwards found to be sections set apart for school purposes under the general law, the reservees (the Indians) had the better title. In that case the holding was based upon a specific reservation in the treaty of particular lands, and the court there refrained from expressing any opinion where the reservee claimed under a treaty which did not designate for him a specific tract of land. The question reserved in that case is the one which is presented in the case now before us for decision.

In *United States v. Romaine,* 255 Fed. 253, the circuit court of appeals for the ninth circuit held that, where there was a treaty which ceded Indian lands to the United States, with reservations of lands to be set aside to them by executive order, the title to the lands subsequently so set aside to them was not acquired through treaty of cession, but the Indians held under their original title. It was there said:

"It is not to be supposed that in making the treaty the government intended to take from the Indians any of the rights they had theretofore enjoyed in the island of Chah-choosen. In *Gaines v. Nicholson,* 9 How. 356, 364 (13 L. Ed. 172), the court said of the Indians' right of occupancy in such a reservation:

" 'It was so much carved out of the territory ceded, and remained to the Indian occupant, as he had never parted with it. He holds, strictly speaking, not under the treaty of cession, but under his original title, confirmed by the Government in the act of agreeing to the reservation.'

"In *United States v. Winans,* 198 U. S. 371, 383, 25 Sup. Ct. 662, 49 L. Ed. 1089, the court held that the right of taking fish in the Columbia river and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians by treaty, was not a grant of right to the Indians, but a reservation by them of rights already possessed and not granted away

by them. In the Enabling Act, by which the territory of Washington was admitted into the Union (Act Feb. 22, 1889, c. 180, § 4, 25 Stat. 676), the people of the newly created state were required to agree and declare that they forever disclaim all right and title—'to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.' "

In *Winters v. United States*, 207 U. S. 564, the court in effect decided the question which had been reserved in the previous case of *Gaines v. Nicholson*, 50 U. S. 356, *supra*, and held that, where a tract of land, the property of the United States, was reserved and set apart

". . . as an Indian reservation as and for a permanent home and abiding place of the Gros Ventre and Assiniboine bands or tribes of Indians in the state (then territory) of Montana, designated and known as the Fort Belknap Indian reservation,"

there was an implied reservation of sufficient amount of water from Milk river, which was the northern boundary of the reservation, for the irrigation of Indian lands, and that this reservation was not affected by the subsequent act of Congress admitting Montana into the Union. It was there said:

"The lands were arid and, without irrigation, were practically valueless. And yet, it is contended, the means of irrigation were deliberately given up by the Indians and deliberately accepted by the Government. The lands ceded were, it is true, also arid; and some argument may be urged, and is urged, that with their cession there was the cession of the waters, without which they would be valueless, and 'civilized commun-

ities could not be established thereon.' And this, it is further contended, the Indians knew, and yet made no reservation of the waters. We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession. The Indians had command of the lands and the waters — command of all their beneficial use, whether kept for hunting, 'and grazing roving herds of stock,' or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate? And, even regarding the allegation of the answer as true, that there are springs and streams on the reservation flowing about 2,900 inches of water, the inquiries are pertinent. If it were possible to believe affirmative answers, we might also believe that the Indians were awed by the power of the Government or deceived by its negotiators. Neither view is possible. The Government is asserting the rights of the Indians. But extremes need not be taken into account. By a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians. And the rule should certainly be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it. On account of their relations to the Government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the Government, even if it could be supposed that they had the intelligence to foresee the 'double sense' which might some time be urged against them.''

This right of the Indians was not abrogated when the territory of Washington was admitted into the Union and became a state, because in § 4 of the Enabling Act it was expressly provided:

''That the people inhabiting said proposed states do agree and declare that they forever disclaim all right

and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; . . ."

After considering the provisions of the treaty and the cases cited, we are of the opinion that in the present case the Quinault Indians own the fish in the Quinault river by the same title and in the same right as they owned them prior to the time of the making of the treaty, and that the state has no right to interfere with or control their right to take fish from a stream which crosses the reservation.

In *Mason v. Sams,* 5 Fed. (2d) 255, the Federal District court for the western district of this state expressed views similar to those which we entertain, as above set forth.

In the case of *State v. Towessnute,* 89 Wash. 478, 154 Pac. 805, there was involved the right of the Yakima Indians to catch fish in violation of the state law outside of the reservation. The question of their right to catch fish within the reservation was not involved in that case, and it has no application here.

In no one of the cases of *Selkirk v. Stephens,* 75 Minn. 335, 75 N. W. 386; *State v. Cooney,* 77 Minn. 518, 80 N. W. 696; and *Ex Parte Crosby,* 38 Nev. 389, 149 Pac. 989, was there a treaty involved such as that made with the Quinault Indians. There was not involved in any of those cases the rights of Indians under a treaty which ceded lands with reservations to be set off to them by executive order, as here, and consequently they cannot be said to be authority for the position taken by the appellant in this case. The

fact that the state has jurisdiction over the acts and conduct of white men on the reservation, as this court has a number of times held, in no way militates against the view that the right of the Quinault Indians to the fish in the river is the same as their right was prior to the ceding and reservation.

The next question is whether the Indians, having the title to the fish which they caught from the Quinault river, have a right to sell them to the respondent to be shipped out of the state. In other words, Is their right to sell the fish protected by the commerce clause of the Federal constitution? This question is answered, as it seems to us, specifically by the case of *Dahnke-Walker Milling Co. v. Bondurant,* 257 U. S. 282, in which it was held that, where a Tennessee corporation, in pursuance of its practice of purchasing grain in Kentucky to be transported to and used in its Tennessee mill, made a contract for the purchase of wheat to be delivered in Kentucky on the cars of a public carrier, intending to forward it as soon as delivery was made, this was a transaction in interstate commerce, notwithstanding the contract was made and was to be performed in Kentucky, and the possibility that the purchaser might change his mind after delivery and sell the grain in Kentucky. It was there said:

"The commerce clause of the Constitution, Art. I, § 8, cl. 3, expressly commits to Congress and impliedly withholds from the several states the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages.

*Brown v. Maryland,* 12 Wheat. 419, 446-447; *American Steel & Wire Co. v. Speed,* 192 U. S. 500, 519. On the same principle, where goods are purchased in one state for transportation to another the commerce includes the purchase quite as much as it does the transportation. *American Express Co. v. Iowa,* 196 U. S. 133, 143. This has been recognized in many decisions construing the commerce clause. Thus it was said in *Welton v. Missouri,* 91 U. S. 275, 280: 'Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities.' In *Kidd v. Pearson,* 128 U. S. 1, 20, it was tersely said: 'Buying and selling and the transportation incidental thereto constitute commerce.' In *United States v. E. C. Knight Co.,* 156 U. S. 1, 13, 'contracts to buy, sell, or exchange goods to be transported among the several states' were declared 'part of interstate trade or commerce.' And in *Addyston Pipe & Steel Co. v. United States,* 175 U. S. 211, 241, the court referred to the prior decisions as establishing that 'interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes not only the transportation of persons and property and the navigation of public waters for that purpose, but also the purchase, sale and exchange of. commodities.' In no case has the court made any distinction between buying and selling or between buying for transportation to another state and transporting for sale in another state. Quite to the contrary, the. import of the decisions has been that if the transportation was incidental to buying or selling it was not material whether it came first or last."

The case of *Pennsylvania v. West Virginia,* 262 U. S. 553, is to the same effect.

The case of *Geer v. State,* 161 U. S. 519, is not in point, because in that case there was only a qualified ownership in the game which the defendant was charged with unlawfully receiving and having in his possession with the wrongful and unlawful intent to

procure the transportation of the same beyond the limits of the state, while in the case now before us, as above seen, the Indians had an unqualified right to the fish, and therefore had the right to sell them to be transported to the state of New York, and such sale and transportation was protected by the interstate commerce clause of the Federal constitution.

The judgment will be affirmed.

PARKER, TOLMAN, and HOLCOMB, JJ., concur.