STATE of Wisconsin, Plaintiff-Respondent,

v.

Hans J. BRAUN, Defendant-Appellant.

Court of Appeals

*Nos. 80–1309, 80–1310. Argued May 29, 1981.—*
*Decided July 22, 1981.*
(Also reported in 309 N.W.2d 875.)

For the defendant-appellant there was a brief and oral argument by *Milton Rosenberg* of the *Indian Law Center* of Madison.

For the plaintiff-respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Mary V. Bowman,* assistant attorney general. Oral argument by *John D. Niemisto,* assistant attorney general.

Before Voss, P.J., Brown and Scott, JJ.

BROWN, J.    Hans J. Braun is a non-Indian wholesale fish dealer. On March 13, 1979, the truck in which Braun was traveling was stopped by Illinois officers at the instigation of Wisconsin conservation officials. A quantity of fish was seized. Braun was later issued two citations which alleged that he had violated Wis. Adm. Code, sec. NR 25.13(1)(a).[1] That section regulated the harvest and tagging of lake trout taken from Lake Superior. Braun moved to dismiss the charges. He asserted that the fish had been caught by enrolled members of the Red Cliff Tribe and that the regulations did not reach Indian fishers. He also contended the two citations were multiplicitous. The trial court denied Braun's motion. We reverse and remand to the trial court for considera-

---

[1] Unless otherwise stated in this opinion, all citations to the Wis. Adm. Code, sec. NR, refer to the regulations that were in effect when the violation occurred.

tion of the reasonableness and necessity of the regulation in this instance.[2]

It is undisputed that the fish Braun was transporting were caught by members of the Red Cliff band, part of the Lake Superior Chippewas, whose treaty rights to fish in Lake Superior were recognized in *State v. Gurnoe*, 53 Wis. 2d 390, 192 N.W.2d 892 (1972). Braun's primary defense is derived from those treaty rights and attacks the ability of the state to regulate Indian fishing. The state contends that Braun, as a non-Indian, possesses no treaty rights personally. Therefore, the state argues, Braun has no standing to challenge the regulations as applied to Indian fishing. If Braun has no standing to assert the treaty rights, his basic theory of defense is foreclosed, and any subsequent issue regarding the reasonableness and necessity of the regulations need not be addressed. Although the trial court did not decide the issue, it did express "substantial doubt that [Braun] even has standing to challenge the jurisdiction [of the court] since his connection with the Indians is not as a member of the tribe who is covered by the treaty." The state acknowledges that the preliminary issue of standing must be resolved before reaching the merits of the case.

The parties have not cited any cases, nor have we found any, which squarely address the question of whether a non-Indian has standing to assert Indian treaty rights.[3] There are, however, several cases in

[2] This court granted leave to appeal the nonfinal order pursuant to Rule 809.50. This matter was submitted to a three judge panel pursuant to Rule 809.41(3).

[3] Essentially, the concept at issue involves the rule of *jus tertii*, the principle governing the standing of litigants to assert the constitutional (or treaty) rights of third parties not before the court. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 443–46 (1972); *Barrows v. Jackson*, 346 U.S. 249, 255–57 (1953). As the Supreme Court observed in *Barrows v. Jackson, Id.* at 257:

which the question has been necessarily resolved in favor of non-Indian standing. In *Pioneer Packing Co. v. Winslow*, 159 Wash. 655, 294 P. 557 (1930), the plaintiff packing company sued to restrain state game wardens from interfering with plaintiff's right to purchase fish on the Quinault Indian reservation and ship them out of state. The outcome of the case turned on the treaty rights of the Quinault Indians to fish free from state regulation.[4] The court found the treaty did grant such right to fish, and, therefore, the tribe "had the right to sell them to be transported [to a different state], and such sale and transportation was protected by the interstate commerce clause of the Federal Constitution." *Id.* at 665, 294 P. at 560. The court held the state could not interfere with the packing company's trade with the Indians.[5]

---

"[I]n the instant case, we are faced with a unique situation in which it is the action of the state court which might result in a denial of constitutional rights and in which it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court. Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained." [Emphasis deleted.]

The Indian fishers, unless charged personally with a violation of the regulations, cannot assert their treaty rights in this instance. Yet, the trial court's decision would effectively curb their treaty right to fish by rendering the fish nonmarketable.

[4] The import of *Pioneer Packing* for standing purposes is not affected by language in that case limiting the state's ability to regulate for conservation purposes. *Id.* at 662, 294 P. at 559. The precedential value of that aspect of the opinion is mitigated by the rulings of *Puyallup Tribe v. Department of Game*, 391 U.S. 392 (1968), and *Department of Game v. Puyallup Tribe*, 414 U.S. 44 (1973).

[5] In *Pioneer Packing*, as in this case, the Indian tribe whose treaty rights were being asserted was not a party to the action.

We conclude that a similar situation exists in this case. Braun allegedly violated the regulations governing the tagging of lake trout taken from Lake Superior. The affidavits filed in this case establish that the fish involved were purchased from Indian fishers fishing pursuant to their treaty rights. It is undisputed that the fish were not tagged in accordance with the regulation.[6] The need to allow Braun to assert treaty defenses is evident. The fish were not tagged because the Indian fishers were asserting their treaty rights to be free from those state regulations not reasonable and necessary to conservation. The state, however, chose not to charge the Indian fishers with regulation violations. The Indian fishers then sold the fish to a third party, Braun, who was then charged with the violation. To deny standing to that third party would prohibit the Indians from marketing the fish commercially because their buyers would risk prosecution. This result would substantially impair their treaty right to fish and would constitute a violation of the federal commerce clause. U.S. Const., art. I, § 8.

We conclude that Braun is entitled to assert the Indians' fishing rights as a defense to the present charges. We reverse and remand, however, so the trial

By reaching the merits and defining the scope of the tribe's fishing rights, the court obviously found that the packing company had standing to assert a treaty defense.

[6] The state argues that Braun's standing cannot be determined upon this record. It contends the fish were not tagged according to internal tribal regulations, and thus Braun cannot be shielded by the treaty. We conclude that such argument properly goes to the merits of the case and not the preliminary issue of standing. The affidavits before the court conclusively establish the source of the fish as Indian fishers taking fish pursuant to their treaty rights. Compliance with tribal tagging standards does not alter that fact.

court can afford the parties the opportunity to address the merits of the regulation.

Turning to the merits of the case, Braun contends the state regulations found in Wis. Adm. Code, sec. NR 25.13(1)(a), do not affect Indian fishers. He raises three related arguments. First, Braun claims that the regulations do not evince a clear intent to reach Indian fishing. Thus, he concludes the Indians do not have fair warning that their commercial fishing is to be regulated. Second, Braun points to the regulations' recent amendments as evidence that the prior regulations were invalid.[7] Third, Braun claims state officials have acquiesced in prior Indian noncompliance with the literal regulations. His affidavits reveal that a tribal system of trout tagging had been established and that the state had unofficially recognized the validity of those tags. Thus, Braun concludes that the regulations were not intended to affect Indian fishing, and the present prosecution exhibits selective enforcement.

■ .

It is settled that the Red Cliff band of the Lake Superior Chippewas was granted fishing rights in Lake Superior by the 1854 treaty. *Gurnoe,* 53 Wis. 2d at 409, 192 N.W.2d at 901. It is also clear that treaty fishing rights are "not a grant of rights to the Indians, but a grant of rights from them,—a reservation of those not granted." *United States v. Winans,* 198 U.S. 371, 381 (1905). However, those rights are not immune from state regulation. In *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398 (1968), the Supreme Court held that:

---

[7] Wisconsin Administrative Code, sec. NR 25, establishing Lake Superior lake trout harvest quotas was amended effective November 1, 1979. Braun concedes that the amended Wis. Adm. Code, sec. NR 25.06, is clearly intended to regulate Indian fishing.

[T]he manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.

The burden rests with the state to show that the regulation it seeks to enforce against the Indian fishers is "reasonable and necessary to prevent a substantial depletion of the fish supply." *Gurnoe*, 53 Wis. 2d at 410, 192 N.W.2d at 902.

We are not persuaded by Braun's arguments that Wis. Adm. Code, sec. NR 25.13(1)(a), was not intended to regulate Indian fishing. That section read as follows:

NR 25.13 Handling and disposition of fish. (1) TAGGING AND DISPOSITION OF ILLEGAL FISH. (a) All dead illegal fish and lake trout taken pursuant to section NR 25.06 shall be tagged with tags furnished by the department before being brought to any shore, dock or port when fishing in open water and before being transported when fishing with nets under the ice. Untagged illegal fish shall not be transferred between watercraft. Such fish shall be individually tagged and such tags shall be sealed and remain attached to the fish until prepared for final consumption, and no such fish or part thereof other than offal shall be transported in any manner without such tag or tags attached thereto. All such dead illegal fish shall be turned over to the department or its authorized agents properly tagged.

Braun contends the cross-reference to Wis. Adm. Code, sec. NR 25.06,[8] which establish harvest quotas for Indian

[8] Wisconsin Administrative Code, sec. NR 25.06, in effect when these citations were issued, provided:

"NR 25.06 Quotas. (1) LAKE SUPERIOR LAKE TROUT HARVEST QUOTAS. (a) The total allowable annual harvest of lake trout by commercial methods during the open season in Wisconsin waters of Lake Superior shall be determined, based upon recommendations from the U.S. fish and wildlife service and the great lakes fishery commission, subject to confirmation

and non-Indian fishers, is insufficient to evince a clear intent to regulate *commercial* Indian fishing. For example, he points to Wis. Adm. Code, sec. NR 25.06(2), which addresses home use of fish by the tribes. The reference in Wis. Adm. Code, sec. NR 25.13(1)(a), to the whole of sec. NR 25.06, despite the home use section,

by the natural resources board. The total allowable annual commercial harvest shall be 100,000 pounds of lake trout.

(b) That quantity of lake trout to be harvested by non-Indian licensed commercial fishers from the waters of Lake Superior shall not exceed 40% by weight of the total annual allowable commercial harvest. The total quota shall be divided among licensed commercial fishers. Individual quotas shall be specified in permits issued for the use of commercial fishing gear pursuant to NR 25.07. Such quotas shall be based on the type of fishing gear employed and shall constitute an allowed incidental catch.

(c) Eligible members of the Red Cliff and Bad River bands of Lake Superior Chippewas as determined by the respective tribal councils may harvest under permits issued by their respective tribal councils 40% of the annual allowable commercial harvest of lake trout from Wisconsin waters of Lake Superior. Copies of said permits will be provided to the department at the time of issue.

(d) The department reserves 20% of the total annual allowable commercial harvest of lake trout to be used for special assessment purposes. Harvest shall be under contract with the department. Licensed non-Indian commercial fishers and Indian fishers shall be equally eligible for contracts provided they have the necessary experience and equipment for such special assessment purposes.

(2) HARVEST OF FISH FOR HOME USE BY LAKE SUPERIOR CHIPPEWAS. (a) Members of the Bad River and Red Cliff bands of Lake Superior Chippewas may harvest species of fish for which there is an open season therefor, during said season, under home use permits issued by their respective tribal councils.

(b) Home use permits will be issued to the heads of households only, and only one permit will be issued to an individual.

(c) Permittees are restricted to the use of no more than 350 feet of gill net and sale of fish taken pursuant to these permits is prohibited. These fishing activities shall be restricted to waters adjacent to the reservations of the Bad River and Red Cliff bands."

creates in Braun's view a fatal ambiguity and muddled intent.

We disagree. Statutes and administrative rules are routinely cross-referenced. Although perhaps the clearer method would have expanded the cross-reference to the applicable subsection of Wis. Adm. Code, sec. NR 25.06, we cannot rule as a matter of law that the state's failure to do so destroys an otherwise clear intent to regulate commercial Indian fishing. That technical shortcoming does not detract from the legitimate state purpose in fish conservation.

Braun's reliance on the regulations' recent amendments is misplaced. Amendment of a statute or administrative rule is not, absent a clear expression to the contrary, an admission of the original statute's or rule's invalidity. There is nothing in the prior or present departmental regulations which indicates the amendments were designed to replace invalid regulations.

Braun's third argument of departmental acquiescence and selective enforcement also fails to support his conclusion. Rather, that contention is properly addressed to the reasonableness and necessity of the state regulatory efforts. A successful showing of selective enforcement of tagging regulations would contradict the alleged necessity of a conservation effort. The argument does not, however, indicate that the state regulations were not intended to affect Indian fishing.

We conclude that Wis. Adm. Code, sec. NR 25.13(1)(a), in effect when Braun was charged, was clearly intended to reach the fishing activities of the Red Cliff band. The language sufficiently apprised the tribe of the allowable catch and approved methods of tagging.

Having concluded that the regulation, on its face, applied to the Red Cliff band, we must now address the reasonableness and necessity of that regulation. The methodology of determining reasonableness and necessity was established in *State v. Peterson,* 98 Wis. 2d 487, 297 N.W.2d 52 (Ct. App. 1980). This court held that "the most efficient, fair and effective procedure is for the state to present its proof at a hearing after a citation is issued, but before a trial on the merits." *Id.* at 490, 297 N.W.2d at 53. The question of reasonableness and necessity is one for the trial court, not a jury. *Id.* at 494, 297 N.W.2d at 55. Without a showing of reasonableness and necessity, a state is precluded by treaty from enforcing its regulations against Indian fishers. Therefore, reasonableness and necessity is an element of subject matter jurisdiction, and the burden is on the state to request an evidentiary hearing on the issue. *Id.* at 495, 297 N.W.2d at 55. The state must prove by a preponderance of the evidence that enforcement of the regulations against Indian fishers is reasonable and necessary to prevent substantial depletion of the fish supply. *Id.*

No hearing on reasonableness and necessity was held before the trial court. The state did not request such a hearing. The issue was not yet before the trial court because of the issue of Braun's ability to present a defense under the treaty.[9] Therefore, we must remand this case for an evidentiary hearing before the trial court to determine the reasonableness and necessity of Wis. Adm. Code, sec. NR 25.13(1)(a).

Braun argues the state has waived any such hearing by not requesting it earlier in this matter. Concededly,

[9] Furthermore, the trial court's decision in this case predated this court's holding in *State v. Peterson,* 98 Wis. 2d 487, 297 N.W.2d 52 (Ct. App. 1980).

it is the state's burden to request a hearing on reasonableness and necessity. However, no waiver can occur. First, the hearing goes to the court's subject matter jurisdiction which cannot be waived. Second, as stated above, the issue did not ripen in this case until it was determined whether Braun had standing to assert a defense under the treaty. Third, there is no prejudice to Braun by requiring an evidentiary hearing upon remand. Testimony and evidence concerning fish populations, management and conservation at the time of these citations is readily available to both parties.

As in *Peterson*, 98 Wis. 2d at 495–96, 297 N.W.2d at 55, the trial court should, on remand, hear evidence, "make findings of fact and then conclude as a matter of law whether the enforcement of sec. NR 25.13 (1) (a) against Indian fishermen is reasonable and necessary to prevent a substantial depletion of the trout supply in Lake Superior."

Braun lastly contends that the two citations issued constitute multiple charges. Both citations alleged that the "truck contained 1,841 lbs. of untagged or improperly tagged lake trout." The regulation cited in both charges was Wis. Adm. Code, sec. NR 25.13 (1) (a). The sole distinction between the two citations is that one alleges Braun "did unlawfully *transport improperly tagged* lake trout," while the other alleges Braun "did unlawfully *have in possession untagged* lake trout and transport same." Each citation carries a maximum $555 forfeiture. Because civil forfeitures are not crimes, sec. 939.12, Stats., the constitutional prohibition against multiplicity derived from the double jeopardy clause is not directly controlling. However, a similar analysis may be used. A person cannot be subject to a double forfeiture if his conduct constituted a single violation, even if his conduct is not a crime.

The trial court denied Braun's motion to dismiss and stated that "[c]learly transporting untagged trout has at least one distinguishable element from possession of and transporting untagged trout." The trial court's decision implies that unlawful *possession* of the fish was the distinguishing element between the two citations. Moreover, the language of the citations offers another distinction, that is, "improperly tagged" and "untagged." We conclude that neither rationale supports the issuance of two separate charges.

The state suggests that the language of the citations was used to differentiate between "improperly tagged lake trout" and "untagged lake trout." However, no such distinction appears in Wis. Adm. Code, sec. NR 25.13(1)(a), which addresses solely the tagging and disposition of illegal fish. Likewise, there is no significant distinction drawn in the definition of "illegal fish" found in Wis. Adm. Code, sec. NR 25.02(11).[10] Untagged and improperly tagged are merely two methods by which the definition of illegal fish may be satisfied. They do not constitute separate violations.

One charge speaks of possession of untagged lake trout, contrary to Wis. Adm. Code, sec. NR 25.13(1)(a). However, that regulation does not proscribe "possession." It mandates the tagging of any dead illegal fish and all lake trout caught in accordance with Wis. Adm. Code, sec. NR 25.06, before being brought to shore or trans-

---

[10] "Illegal fish" is defined as:

"[A]ny or all fish taken at a time other than the open season, or of sizes other than prescribed in section NR 25.05 or in excess of quotas as prescribed in section NR 25.06, or taken by methods other than those prescribed in this chapter, or of the following species: smallmouth bass, largemouth bass, rock bass, crappie, muskellunge, sturgeon, all species of salmon and trout except as otherwise prescribed in this chapter."

Wis. Adm. Code, sec. NR 25.02(11).

ported. Possession of illegal fish is, however, directly addressed by Wis. Adm. Code, sec. NR 25.13(2)(a), which provides:

(2) POSSESSION AND TRANSPORTATION OF ILLEGAL FISH. (a) No person shall transport or cause to be transported, deliver, receive, offer to deliver or receive for transportation, have in possession or under control, sell, trade or barter, or offer to sell, trade or barter, or to smoke or salt any illegal fish, irrespective of how, when or where taken or caught except as authorized by the department.

While it is self-evident that possession of fish is a physical prerequisite to transporting fish, the two subsections reflect different objectives. Subsection 25.13 (1)(a) is directed to the activities of commercial fishers. It requires proper tagging at the time the fish are caught. Subsection 25.13(2)(a), on the other hand, is intended to reach those involved in the commercial sale and trade of illegal fish. It is that section which provides the appropriate regulatory basis for Braun's violations. Therefore, upon remand, we direct the trial court to allow the state leave to amend one citation to reflect the proper regulation involved. Since Braun's conduct constitutes a single offense, the other charge shall be dismissed. Because this proceeding is still in a preliminary stage, Braun cannot be prejudiced by allowing amendment of the charge. The treaty fishing right theory of defense is not affected by the amendment.

*By the Court.*—Order reversed and cause remanded with directions.