**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA; SUQUAMISH INDIAN TRIBE; SAUK-SUIATTLE TRIBE; STILLAGUAMISH TRIBE; HOH TRIBE; JAMESTOWN S'KLALLAM TRIBE; LOWER ELWHA BAND OF KLALLAMS; PORT GAMBLE BAND CLALLAM; NISQUALLY INDIAN TRIBE; NOOKSACK INDIAN TRIBE; SKOKOMISH INDIAN TRIBE; SQUAXIN ISLAND TRIBE; UPPER SKAGIT INDIAN TRIBE; TULALIP TRIBES; LUMMI INDIAN NATION; QUINAULT INDIAN NATION; PUYALLUP TRIBE; CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION; QUILEUTE INDIAN TRIBE; MAKAH INDIAN TRIBE; SWINOMISH INDIAN TRIBAL COMMUNITY; MUCKLESHOOT INDIAN TRIBE, *Plaintiffs-Appellees*, <br><br> v. <br><br> STATE OF WASHINGTON, *Defendant-Appellant.* | No. 13-35474 <br><br> D.C. Nos. <br> 2:01-sp-00001-RSM <br> 2:70-cv-09213-RSM <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, Chief District Judge, Presiding

Argued and Submitted October 16, 2015
Seattle, Washington

Filed June 27, 2016
Amended March 2, 2017

Before: William A. Fletcher and Ronald M. Gould, Circuit
Judges, and David A. Ezra,[*] District Judge.

Opinion by Judge W. Fletcher

---

[*] The Honorable David A. Ezra, District Judge for the U.S. District
Court for the District of Hawai'i, sitting by designation.

## SUMMARY[**]

### Tribal Fishing Rights

The panel amended the opinion filed on June 27, 2016; and affirmed the district court's order issuing an injunction directing the State of Washington to correct culverts, which allow streams to flow underneath roads, because they violated, and continued to violate, the Stevens Treaties, which were entered in 1854–55 between Indian tribes in the Pacific Northwest and the Governor of Washington Territory.

As part of the Treaties, the Tribes relinquished large swaths of land, watersheds, and offshore waters adjacent to those areas (collectively, the "Case Area"), in what is now the State of Washington. In exchange, the Tribes were guaranteed a right to engage in off-reservation fishing.

In 1970, the United States brought suit against the State of Washington on behalf of the Tribes to resolve a persistent conflict over fishing rights; and in a 1974 decision, the district court authorized the parties to invoke its continuing jurisdiction to resolve continuing disputes.

The panel held that in building and maintaining barrier culverts within the Case Area, Washington violated, and was continuing to violate, its obligation to the Tribes under the Treaties. The panel also held that because treaty rights belong to the Tribes rather than the United States, it was not the prerogative of the United States to waive them.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concerning the State of Washington's cross-request seeking an injunction that would require the United States to fix its culverts before Washington repaired its culverts, the panel held that Washington's cross-request was barred by sovereign immunity, and Washington did not have standing to assert any treaty rights belonging to the Tribes. Specifically, the panel held that Washington's cross-request for an injunction did not qualify as a claim for recoupment. The panel also held that the United States did not waive its own sovereign immunity by bringing suit on behalf of the Tribes. The panel further held that any violation of the Treaties by the United States violated rights held by the Tribes rather than the State, and the Tribes did not seek redress against the United States in this proceeding.

The panel held that the district court did not abuse its discretion in enjoining Washington to correct most of its high-priority barrier culverts within seventeen years, and to correct the remainder at the end of their natural life or in the course of a road construction project undertaken for independent reasons. The panel rejected Washington's objections that the injunction was too broad, that the district court did not defer to the State's expertise, that the court did not properly consider costs and equitable principles, that the injunction impermissibly intruded into state government operations, and that the injunction was inconsistent with federalism principles.

Addressing the State of Washington's petition for panel rehearing and for rehearing en banc, the panel rejected Washington's argument that it should have been awarded, as recoupment or set-off, a monetary award from the United States. The panel also rejected Washington's contention that because of the presence of non-state-owned barrier culverts

on the same streams as state-owned barrier culverts, the benefits obtained from remediation of state-owned culverts would be insufficient to justify the district court's injunction.

---

**COUNSEL**

Noah G. Purcell (argued), Solicitor General; Laura J. Watson, Deputy Solicitor General; Robert W. Ferguson, Attorney General; Jessica E. Fogel, Assistant Attorney General; Office of the Attorney General, Olympia, Washington; for Defendant-Appellant State of Washington.

John C. Sledd (argued), Jane G. Steadman, Cory J. Albright, and Philip E. Katzen; Kanji & Katzen, PLLC, Seattle, Washington; for Plaintiffs-Appellees.

David C. Shilton (argued), Vanessa Boyd Willard, and Evelyn S. Ying, Attorneys; United States Department of Justice, Environment & Natural Resources Division; Washington, D.C., for Plaintiff-Appellee United States.

Pamela B. Loginsky, Washington Association of Prosecuting Attorneys, Olympia, Washington; Douglas D. Shaftel, Pierce County Deputy Prosecuting Attorney; for Amicus Curiae Washington State Association of Counties.

Ellen F. Rosenblum, Attorney General; Anna M. Joyce, Solicitor General; Michael A. Casper, Deputy Solicitor General; Stephanie L. Striffler, Senior Assistant Attorney General; Oregon Department of Justice, Salem, Oregon; for Amicus Curiae State of Oregon.

Colette Routel, Associate Professor and Co-Director, Indian Law Clinic, William Mitchell College of Law, Saint Paul, Minnesota, for Amicus Curiae Indian Law Professors.

Amanda W. Goodin and Janette K. Brimmer, Earthjustice, Seattle, Washington, for Amicus Curiae Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources.

Stephanie L. Striffler, Senior Assistant Attorney General; Michael A. Casper, Deputy Solicitor General; Anna M. Joyce, Solicitor General; Ellen F. Rosenblum, Attorney General; Office of the Attorney General, Salem, Oregon; for Amicus Curiae State of Oregon.

Dale Schowengerdt, Solicitor; Timothy C. Fox, Attorney General; Attorney General's Office, Helena, Montana; for Amicus Curiae State of Montana.

Clay R. Smith, Deputy Attorney General; Clive J. Strong, Chief of Natural Resources; Lawrence G. Wasden, Attorney General; Office of the Attorney General, Boise, Idaho; for Amicus Curiae State of Idaho.

Dominic M. Carollo, Yockim Carollo LLP, Roseburg, Oregon, for Amici Curiae Klamath Critical Habitat Landowners Inc., Modoc Point Irrigation District, Mosby Family Trust, Sprague River Water Resource Foundation Inc., and TPC LLC.

**ORDER**

The opinion filed on June 27, 2016 is amended as follows:

At 855 of the published opinion, *U.S. v. Washington*, 827 F.3d 836 (9th Cir. 2016), add the following subheading beneath "C.  Washington's Cross-Request":

"1.  Injunction."

On the same page, add "for an injunction" following "The district court struck the cross request . . .".

At 855–56, change the numbering of the subheadings of "Sovereign Immunity" and "Standing" from 1, 2 to a, b.

At 856, just above subsection D, add the following text:

2.  Recoupment of Part of Washington's Costs

In its Petition for Panel Rehearing and for Rehearing En Banc, filed after our opinion came down, *see United States v. Washington*, 827 F.3d 836 (9th Cir. 2016), Washington contends that we misconstrued its appeal of the district court's denial of its cross-request.  Washington writes in its Petition:

> The State's original [cross-request] sought a variety of remedies, including that the federal government be required to (1) pay part of the cost of replacing state culverts that were designed to federal standards; (2) take actions on federal lands to restore salmon

> runs; and (3) replace federal culverts in
> Washington. But on appeal, the State pursued
> only the first of these remedies.

We did not, and do not, so understand the State's appeal. Contrary to Washington's statement, it did appeal the district court's denial of its cross-request for an injunction requiring the United States to repair or replace the United States' own barrier culverts. It did not appeal a denial of a request that the United States be required to pay part of its costs to repair or replace its culverts.

In the district court, Washington stated in the body of its cross-request that "[t]he United States has a duty to pay all costs incurred by the State to identify and fix any and all barrier culverts." But in its demand for relief, Washington did not demand any monetary payment from the United States, unless its boilerplate request ("The State of Washington further requests all other relief the Court deems just and equitable") could be deemed such a demand. Not surprisingly, in denying Washington's cross-request, the district court did not discuss a demand for monetary payment from the United States. In its brief to us, Washington writes in the introduction that the district court erred in denying its request to allow the State "to recoup some of the costs of compliance from the United States because it specified the culvert design and caused much of the decline in the salmon runs." But Washington makes no argument in the body of its brief that it should be allowed to recover from the United States any part of the cost to repair or replace its own barrier culverts.

When considering Washington's appeal, we did not understand it to argue that it should have been awarded, as

recoupment or set-off, a monetary award from the United States. Given Washington's failure to make this argument in the body of its brief, the argument was waived. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). However, given the vigor with which Washington now makes the argument in its Petition for Rehearing and Rehearing En Banc, we think it appropriate to respond on the merits.

Washington's argument is easily rejected. As recounted above, a claim for recoupment must, *inter alia*, "seek relief of the same kind or nature as the plaintiff's suit." *Berrey*, 439 F.3d at 645. Washington's claim does not satisfy this criterion. The United States, the plaintiff, sought injunctive relief against Washington. Washington sought a monetary award. These two forms of relief are not "of the same kind or nature."

At 859, just prior to the paragraph beginning, "Witnesses at trial. . .", add the following text:

The State contends that because of the presence of non-state-owned barrier culverts on the same streams as state-owned barrier culverts, the benefit obtained from remediation of state-owned culverts will be insufficient to justify the district court's injunction. The State writes:

> [S]tate-owned culverts are less than 25% of all known barrier culverts, and in some places, non-state culverts outnumber state-owned culverts by a factor of 36 to 1. Any benefit from fixing a state-owned culvert will not be realized if fish are blocked by other culverts in the same stream system.

There are several answers to the State's contention. First, it is true that in calculating whether a state culvert is a barrier culvert, and in determining the priority for requiring remediation, the court's injunction ignores non-state barriers on the same stream. But in so doing, the court followed the practice of the state itself. Paul Sekulich, formerly division manager in the restoration division in the habitat program of the Washington Department of Fish and Wildlife ("WDFW"), testified in the district court:

> Q: When you calculate a priority index number for a [state-owned] culvert, do you account for the presence of other fish passage barriers in a watershed?
>
> A: . . . When the priority index is calculated, it treats those other barriers as transparent. The reason we do that, we don't know when those other barriers are being corrected. So by treating them as transparent, you do a priority index that looks at potential habitat gain as if all those barriers would be corrected at some point in time.

Washington State law requires that a "dam or other obstruction across or in a stream" be constructed in such a manner as to provide a "durable and efficient fishway" allowing passage of salmon. Wash. Rev. Code § 77.57.030(1). If owners fail to construct or maintain proper fishways, the Director of WDFW may require them do so at their own expense. *Id.* at § 77.57.030(2).

Second, in 2009, on streams where there were both state and non-state barriers, 1,370 of the 1,590 non-state barriers,

or almost ninety percent, were upstream of the state barrier culverts. Sixty nine percent of the 220 downstream non-state barriers allowed partial passage of fish. Of the 152 that allowed partial passage, "passability" was 67% for 80 of the barriers and 33% for 72 of them.

Third, the specific example provided by the state is a culvert on the Middle Fork of Wildcat Creek under State Route 8 in Grays Harbor County. The State is correct that there are 36 non-state barriers and only one state barrier culvert on this creek. The State fails to mention, however, that all of the non-state barriers are upstream of the state culvert. Further, it is apparent from the map in the district court record that the nearest non-state barrier is almost a half mile upstream.

No new Petition for Panel Rehearing or Petition for Rehearing en Banc will be entertained. Pending petitions remain pending and need not be renewed.

## OPINION

W. FLETCHER, Circuit Judge:

In 1854 and 1855, Indian tribes in the Pacific Northwest entered into a series of treaties, now known as the "Stevens Treaties," negotiated by Isaac I. Stevens, Superintendent of Indian Affairs and Governor of Washington Territory. Under the Stevens Treaties ("Treaties") at issue in this case, the tribes relinquished large swaths of land west of the Cascade Mountains and north of the Columbia River drainage area, including the Puget Sound watershed, the watersheds of the

Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas (collectively, the "Case Area"), in what is now the State of Washington. In exchange for their land, the tribes were guaranteed a right to off-reservation fishing, in a clause that used essentially identical language in each treaty. The "fishing clause" guaranteed "the right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory."

In 2001, pursuant to an injunction previously entered in this long-running litigation, twenty-one Indian tribes ("Tribes"), joined by the United States, filed a "Request for Determination" — in effect, a complaint — in the federal district court for the Western District of Washington. The Tribes include the Suquamish Indian Tribe, Jamestown S'Klallam, Lower Elwha Band of Klallams, Port Gamble Clallam, Nisqually Indian Tribe, Nooksack Tribe, Sauk-Suiattle Tribe, Skokomish Indian Tribe, Squaxin Island Tribe, Stillaguamish Tribe, Upper Skagit Tribe, Tulalip Tribes, Lummi Indian Nation, Quinault Indian Nation, Puyallup Tribe, Hoh Tribe, Confederated Tribes and Bands of the Yakama Indian Nation, Quileute Indian Tribe, Makah Indian Tribe, Swinomish Indian Tribal Community, and the Muckleshoot Indian Tribe. The Tribes contended that Washington State ("Washington" or "the State") had violated, and was continuing to violate, the Treaties by building and maintaining culverts that prevented mature salmon from returning from the sea to their spawning grounds; prevented smolt (juvenile salmon) from moving downstream and out to sea; and prevented very young salmon from moving freely to seek food and escape predators. In 2007, the district court held that in building and maintaining these culverts Washington had caused the size of salmon runs in the Case

Area to diminish and that Washington thereby violated its obligation under the Treaties. In 2013, the court issued an injunction ordering Washington to correct its offending culverts.

We affirm the decision of the district court.

## I. Historical Background

For over a hundred years, there has been conflict between Washington and the Tribes over fishing rights under the Treaties. We recount here some of the most salient aspects of this history.

When white settlers arrived in the Washington territory in the second half of the nineteenth century, many settled on riparian land and salt-water shoreline. Even though the majority of these settlers were not themselves fishermen, they blocked access to many of the Tribes' traditional fishing sites. By the end of the century, white commercial fishermen were catching enormous quantities of salmon, first on the Columbia River and then in Puget Sound as well, supplying large-scale canneries.

In 1894, L. T. Erwin, the United States Indian Agent for the Yakimas, complained that whites had blocked access to the Indians' "accustomed fisheries" on the Columbia River: "[I]nch by inch, [the Indians] have been forced back until all the best grounds have been taken up by white men, who now refuse to allow them to fish in common, as the treaty provides." *Report of the Secretary of the Interior, 1894* (3 vols., Washington, D.C., 1894, II, 326). In 1897, D. C. Govan, the Indian Agent for the Tulalips on Puget Sound reported that "the Alaska Packing Company and other

cannery companies have practically appropriated all the best fishing grounds at Point Roberts and Village Point, where the Lummi Indians have been in the habit of fishing from time immemorial." *Annual Reports of the Department of the Interior, 1897: Report of the Commissioner of Indian Affairs* (Washington, D.C., 1897, 297). In 1905, Charles Buchanan, the new Indian Agent for the Tulalips, complained, "The tremendous development of the fisheries by traps and by trust methods of consolidation, concentration, and large local development are seriously depleting the natural larders of our Indians and cutting down their main reliance for support and subsistence. Living for them is becoming more precarious year by year." *Annual Reports of the Department of the Interior, 1905: Indian Affairs* (Washington, D.C., 1906, Part I, 362). During this period, "[t]he superior capital, large-scale methods, and aggressiveness of whites . . . quickly led to their domination of the prime fisheries of the region." Donald L. Parman, *Inconstant Advocacy: The Erosion of Indian Fishing Rights in the Pacific Northwest*, 53 Pacific Hist. Rev. 163, 167 (1984).

The United States Supreme Court first addressed the conflict over fisheries in *United States v. Winans*, 198 U.S. 371 (1905). The Winans brothers had acquired land at a prime Yakima fishing site on the Washington side of the Columbia River. *See* Michael C. Blumm and James Brunberg, *'Not Much Less Necessary . . . Than the Atmosphere They Breathed': Salmon, Indian Treaties, and the Supreme Court — a Centennial Remembrance of* United States v. Winans *and Its Enduring Significance*, 46 Nat. Resources J. 489, 523 (2006). Under an exclusive license from the State, the Winanses operated "fish wheels" at the site. Fish wheels were essentially mechanized dip nets "capable of catching salmon by the ton." *Washington v.*

*Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 679 (1979). The Winanses refused to allow the Yakimas to cross over or to camp on their land in order to fish at the site.

The Yakimas had signed one of the Stevens Treaties in 1855. The United States brought suit against the Winanses on the Yakimas' behalf. The Supreme Court held that the land owned by the Winanses, previously conveyed by patent from the government, was by virtue of the treaty subject to an easement allowing access to the Yakimas' "usual and accustomed" fishing site. The Court held, further, that the State could not license the Winanses to "construct and use a device which gives them exclusive possession of the fishing places, as it is admitted a fish wheel does." *Winans*, 198 U.S. at 382. *See also Seufort Bros. Co. v. United States*, 249 U.S. 194 (1919) (holding that the Yakimas had rights under the treaty on the Oregon, as well as the Washington, side of the river).

In 1915, Charles Buchanan, still the Indian Agent for the Tulalips, complained to the Washington legislature of the diminished supply of salmon and the harsh application of Washington's fish and game laws against the Indians. He wrote:

> [M]ore recently, the use of large capital, mechanical assistance, numerous great traps, canneries, etc., and other activities allied to the fishery industry, have greatly lessened and depleted the Indians' natural sources of food supply. In addition thereto the stringent and harsh application to Indians of the State game and fish laws have made it still and

> increasingly precarious for him to procure his
> natural foods in his natural way.

*Rights of the Puget Sound Indians to Game and Fish*, 6 Wash. Hist. Quart. 109, 110 (Apr. 1915).

The next year, the Washington Supreme Court upheld the sort of "stringent and harsh application . . . of game and fish laws" of which Buchanan complained.    In *State v. Towessnute*, 154 P. 805, 806 (Wash. 1916), a member of the Yakima Nation named Towessnute was charged with off-reservation fishing without a license in a manner forbidden by state law.  Towessnute defended on the ground that he was fishing in the traditional manner at one the Yakimas' usual and accustomed places, and that he was entitled to do so under the treaty at issue in *Winans*.  *Id.*  Characterizing the treaty as a "dubious document," *id.*, the Washington Supreme Court rejected the defense:

> The premise of Indian sovereignty we reject.
> The treaty is not to be interpreted in that light.
> At no time did our ancestors in getting title to
> this continent, ever regard the aborigines as
> other than mere occupants . . . of the soil.

*Id.* at 807.  The Court read the Supreme Court's holding in *Winans* as requiring easements across private land, but at the same time as endorsing the authority of the state, through the exercise of its "police power," to enact regulatory laws restricting Indian fishing rights.  *Id.* at 809.  *See also State v. Alexis*, 154 P. 810 (Wash. 1916) (holding the same under the Stevens Treaty with the Lummi Tribe in Puget Sound).

Much traditional Indian fishing was done with traps and nets in rivers, catching mature salmon when they returned to their native habitat to spawn.  White commercial fishermen, by contrast, often fished in salt water, using equipment that most Indians could not afford and catching both mature and immature salmon.  Beginning in the early 1900s, the State regulated the salmon fishery in Puget Sound in such a way that Indians who fished in rivers were increasingly unable to exercise their off-reservation treaty right to fish in their usual and accustomed places and in their traditional manner.  For example, in 1907 the Washington legislature forbade all off-reservation fishing above the tide line — by whites and Indians alike — except by hook and line.  Wash. Sess. Laws Ch. 247, Sec. 2 (1907).

In 1934, Washington voters adopted Initiative 77, a measure that limited off-reservation commercial fishing to certain portions of Puget Sound and banned the use of fixed gear, such as the "pound net, fish trap, fish wheel, scow fish wheel, set net, or any fixed appliance," to catch salmonids. Init. Measure No. 77, State of Wash. Voting Pamphlet 5 (Nov. 6, 1934).  According to a report commissioned by the federal Bureau of Indian Affairs, the passage of Initiative 77 "constituted a serious blow to the Indian fishing being carried on at usual and accustomed grounds":

> [D]ue to their extremely limited financial means, [the Indians'] gear necessarily must be obtainable at a minimum of expense. Generally speaking, the Indians are unable to finance the purchase of other more expensive gear and operating equipment, the use of which was not entirely outlawed. In order to continue to provide the necessities of life, the

> Indians, as a result of the above conservation statute, were literally forced to confine their fishing with such gear to reservation waters. The fact that such was the situation led to considerable agitation in the Pacific Northwest and especially in the [S]tate of Washington looking to the further curtailment of the Indians' commercial fishery.

Edward Swindell, *Report on Source, Nature and Extent of Fishing, Hunting, and Miscellaneous Rights of Certain Indian Tribes in Washington and Oregon* 95 (1942).

In subsequent years, the State continued to assert authority to regulate off-reservation fishing by Indians, including authority to require purchase of fishing licences. In 1939, Sampson Tulee, a Yakima Indian, was criminally charged with off-reservation commercial fishing with a dip net on the Columbia River without a state license. Citing *Towessnute* and *Alexis*, the Washington Supreme Court affirmed the conviction as a valid exercise of the State's police powers. *Washington v. Tulee*, 109 P.2d 280, 287 (Wash. 1941) ("Washington enjoys to the full the exercise of its police powers."). The United States Supreme Court reversed. The Court held that while the State had the power, consistent with the treaty, to regulate fishing by both Indians and non-Indians to the degree "necessary for the conservation of fish," the exaction of a license fee "cannot be reconciled with a fair construction of the treaty." *Tulee v. Washington*, 315 U.S. 681, 684–85 (1942).

After *Tulee*, state officials continued to enforce restrictions on off-reservation fishing by Puget Sound

Indians, even when that fishing was conducted at the Indians' usual and accustomed places:

> Over the years the state fish and game authorities have asserted that Indian treaty-protected fishing exists only on the reservations, and have acted to enforce this position. Injunctions against off-reservation fishing by Indians of the Nisqually, Puyallup, and Muckleshoot tribes have been obtained and enforcement actions carried out even while the injunctions are being contested in the courts. Arrests of fishermen and confiscation of gear have seriously hampered the Indians. Valuable gear held by the state as evidence can effectively put the fisherman out of business during several runs of fish, even though he may eventually win his case.

Walter Taylor, *Uncommon Controversy: Fishing Rights of the Muckleshoot, Puyallup, and Nisqually Indians* 60 (1970). As a result of the State's hostility to off-reservation fishing, the Indians' share of the overall catch was relatively small. For example, from 1958 through 1967, the shares of the total salmon catch in Puget Sound were 6% for Indian fishing, 8.5% for sports fishing, and 85.5% for commercial fishing. *Id.* at 123, 126.

Beginning in the early 1960s, the State substantially increased its enforcement against off-reservation fishing in Puget Sound. *See generally* Bradley G. Shreve, *"From Time Immemorial": The Fish-in Movement and the Rise of Intertribal Activism*, 78 Pacific Hist. Rev. 403, 411–15 (2009). In response, in 1964 the National Indian Youth

Council organized a large demonstration in Olympia to demand that the State acknowledge their treaty fishing rights. *See Uncommon Controversy*, *supra*, at 107–13. During the 1960s and early 1970s, in what came to be called the "fish wars," some Indians fished openly and without licenses in "fish-ins" to bring attention to the State's prohibitions against off-reservation fishing. State reaction to the "fish-ins" sometimes led to violence. *See, e.g.*, Associated Press, "Shots Fired, 60 Arrested in Indian-Fishing Showdown," *Seattle Times*, Sept. 9, 1970; Alex Tizon, "The Boldt Decision / 25 Years — The Fish Tale That Changed History," *Seattle Times*, Feb. 7, 1999 (describing the State's "military-style campaign," employing "surveillance planes, high-powered boats and radio communications," as well as "tear gas," "billy clubs," and "guns").

In 1970, in an effort to resolve the persistent conflict between the State and the Indians, the United States brought suit against the State on behalf of the Tribes. The dispute now before us is part of that litigation.

## II. Anadromous Fisheries and Washington's Barrier Culverts

Anadromous fish, such as salmon, hatch and spend their early lives in fresh water, migrate to the ocean to mature, and return to their waters of origin to spawn. Washington is home to several anadromous fisheries, of which the salmon fishery is by far the most important. Before the arrival of white settlers, returning salmon were abundant in the streams and rivers of the Pacific Northwest. Present-day Indian tribes in the Pacific Northwest eat salmon as an important part of their diet, use salmon in religious and cultural ceremonies, and fish for salmon commercially.

Roads often cross streams that salmon and other anadromous fish use for spawning. Road builders construct culverts to allow the streams to flow underneath roads, but many culverts do not allow fish to pass easily. Sometimes they do not allow fish passage at all. A "barrier culvert" is a culvert that inhibits or prevents fish passage. Road builders can avoid constructing barrier culverts by building roads away from streams, by building bridges that entirely span streams, or by building culverts that allow unobstructed fish passage.

Four state agencies are responsible for building and managing Washington's roads and the culverts that pass under them: Washington State Department of Transportation ("WSDOT"), Washington State Department of Natural Resources ("WSDNR"), Washington State Parks and Recreation Commission ("State Parks"), and Washington Department of Fisheries and Wildlife ("WDFW"). Of these, WSDOT, the agency responsible for Washington's highways, builds and maintains by far the most roads and culverts.

## III. Earlier Proceedings

In 1970, the United States, on its own behalf and as trustee for Pacific Northwest tribes, sued Washington in federal court in the Western District of Washington. The United States sought declaratory and injunctive relief based on the fishing clause of the Treaties. *United States v. State of Washington*, 384 F. Supp. 312, 327–28 (W.D. Wash. 1974) ("*Washington I*"). In what has come to be known as the "Boldt decision," District Judge George H. Boldt divided the case into two phases. Phase I was to determine what portion, if any, of annually harvestable fish were guaranteed to the Tribes by the fishing clause. Phase II was to determine

whether the fishing clause extends to hatchery fish, and whether it requires Washington to prevent environmental degradation within the Case Area.

In Phase I, Judge Boldt held that the phrase "the right of taking fish . . . in common with all citizens" gives the Tribes the right to take up to fifty percent of the harvestable fish in the Case Area, subject to the right of non-treaty fishers to do the same. *Id*. at 343. The Supreme Court affirmed in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ("*Fishing Vessel*"). The Court specified that fifty percent was a ceiling rather than a floor, and that the fishing clause guaranteed "so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living." *Id.* at 686. In accordance with its standard practice of interpreting Indian treaties in favor of the tribes, the Court interpreted the clause as promising protection for the tribes' supply of fish, not merely their share of the fish. The Court wrote:

> Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent.

*Id.* at 676.

In 1976, the United States initiated Phase II of the litigation, asking for a declaratory judgment clarifying the Tribes' rights with respect to the "hatchery fish" issue and to the "environmental" issue. *United States v. State of Washington*, 506 F. Supp. 187, 194 (W.D. Wash. 1980) ("*Washington II*"). The district court held, first, that hatchery fish must be included in determining the share of fish to which the Tribes are entitled. *Id.* at 197. It held, second, that the Tribes' right to "a sufficient quantity of fish to satisfy their moderate living needs" entailed a "right to have the fishery habitat protected from man-made despoliation." *Id.* at 208, 203.

Sitting en banc, we affirmed in part and vacated in part. *United States v. State of Washington*, 759 F.2d 1353 (9th Cir. 1985) (en banc) ("*Washington III*"). We affirmed the district court's decision that hatchery fish must be included in determining the share of salmon to be allocated to the Tribes:

> The hatchery programs have served a mitigating function since their inception in 1895. They are designed essentially to replace natural fish lost to non-Indian degradation of the habitat and commercialization of the fishing industry. Under these circumstances, it is only just to consider such replacement fish as subject to treaty allocation. For the tribes to bear the full burden of the decline caused by their non-Indian neighbors without sharing the replacement achieved through the hatcheries,

> would be an inequity and inconsistent with the
> Treaty.

*Id.* at 1360 (citations omitted).

We vacated the court's decision on the environmental issue. We held that the issue was too broad and varied to be resolved in a general and undifferentiated fashion, and that the issue of human-caused environmental degradation must be resolved in the context of particularized disputes. We wrote:

> We choose to rest our decision in this case on the proposition that issuance of the declaratory judgment on the environmental issue is contrary to the exercise of sound judicial discretion. The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case.

*Id.* at 1357. Although we vacated the district court's decision with respect to the environmental issue, we made clear that we were not absolving Washington of environmental obligations under the fishing clause. We concluded the section of our opinion devoted to the environmental issue by emphasizing that Washington "is bound by the treaty." *Id.*

Judge Boldt's 1974 decision authorized the parties to invoke the continuing jurisdiction of the district court to

resolve disputes "concerning the subject matter of this case." *Washington I*, 384 F. Supp. at 419; *see also United States v. Washington*, 573 F.3d 701, 705 (9th Cir. 2009).  For such disputes, the court directed the parties to "file with the clerk of this court . . . a 'Request for Determination' setting forth the factual nature of the request and any legal authorities and argument which may assist the court, along with a statement that unsuccessful efforts have been made by the parties to resolve the matter, whether a hearing is required, and any factors which bear on the urgency of the request." *Washington I*, 384 F. Supp. at 419.

In 2001, the Tribes filed a Request for Determination ("Request"), seeking "to enforce a duty upon the State of Washington to refrain from constructing and maintaining culverts under State roads that degrade fish habitat so that adult fish production is reduced."  The Tribes sought a permanent injunction from the district court "requiring Washington to identify and then to open culverts under state roads and highways that obstruct fish passage, for fish runs returning to or passing through the usual and accustomed grounds and stations of the plaintiff tribes."

The United States joined the Tribes' Request, seeking a declaration from the court that:

> The right of taking fish secured to the plaintiff tribes in the Stevens Treaties imposes a duty upon the State of Washington to refrain from degrading the fishery resource through the construction or maintenance of culverts under State owned roads and highways in a way that deprives the Tribes of a moderate living from the fishery.

The State has violated and continues to violate the duty owed to the plaintiff tribes under the Stevens Treaties through the operation and maintenance of culverts which reduce the number of fish that would otherwise return to or pass through the Tribes' usual and accustomed fishing grounds and stations to such a degree as would deprive the Tribes of the ability to earn a moderate living from the fishery.

The United States sought a permanent injunction that would require Washington "within five years of the date of judgment (or such other time period as the Court deems necessary and just)" to "repair, retrofit, maintain, or replace" culverts that "degrade appreciably" the passage of fish.

Washington and the defendant state agencies (collectively "Washington" or "the State") answered by declaring that there is "no treaty-based right or duty of fish habitat protection as described" in the Request. In the alternative, Washington emphasized that some of its barrier culverts pass under highways funded in part by the United States, and that these highways were "designed according to standards set or approved" by the Federal Highway Administration, leading Washington to believe that its culverts complied with the Treaties. Further, Washington asserted that the United States and the Tribes have built and maintained barrier culverts on their own lands within the Case Area. Washington asserted that the United States "has a duty to take action on its own lands so as not to place on the State of Washington an unfair burden of complying with any such treaty-based duty."

Washington also made a "cross-request" — in effect, a counterclaim — against the United States seeking a declaration that the United States has violated its own duty to the Tribes under the Treaties, and seeking an injunction that would require the United States to modify or replace its own barrier culverts. The district court dismissed the cross-request on the ground that the United States had not waived its sovereign immunity. The court later denied Washington's request to file an amended cross-request on the additional ground that Washington did not have standing. It wrote, "[T]he State may not assert a treaty-based claim on behalf of the Tribes. . . . The decision as whether and when to assert that claim against the United States is for the Tribes alone."

The district court granted summary judgment in favor of the Tribes and the United States, concluding that the dispute involved the kind of "concrete facts" that were lacking in *Washington III*. The court held, first, that "the right of taking fish, secured to the Tribes in the Stevens Treaties, imposes a duty upon [Washington] to refrain from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest." It held, second, that "the State of Washington currently owns and operates culverts that violate this duty."

The district court conducted a bench trial in 2009 and 2010 to determine the appropriate remedy. After failed efforts to reach a settlement, the court issued both a Memorandum and Decision and a Permanent Injunction. In its Memorandum and Decision, issued in 2013, the court found that Governor Stevens had assured the Tribes that they would have an adequate supply of salmon forever. The court wrote:

> During the negotiations leading up to the signing of the treaties, Governor Isaac Stevens and other negotiators assured the Tribes of their continued access to their usual fisheries. *Governor Stevens assured the Tribes that even after they ceded huge quantities of land, they would still be able to feed themselves and their families forever. As Governor Stevens stated, "I want that you shall not have simply food and drink now but that you may have them forever."*

(Emphasis added.)

The court found that salmon stocks in the Case Area have declined "alarmingly" since the Treaties were signed, and "dramatically" since 1985. The court wrote, "A primary cause of this decline is habitat degradation, both in breeding habitat (freshwater) and feeding habitat (freshwater and marine areas) . . . . One cause of the degradation of salmon habitat is . . . culverts which do not allow the free passage of both adult and juvenile salmon upstream and downstream." The "consequent reduction in tribal harvests has damaged tribal economies, has left individual tribal members unable to earn a living by fishing, and has caused cultural and social harm to the Tribes in addition to the economic harm."

The district court entered a Permanent Injunction on the same day it issued its Memorandum and Decision. The court ordered the State, in consultation with the Tribes and the United States, to prepare within six months a current list of all state-owned barrier culverts within the Case Area. It ordered WSDNR, State Parks, and WDFW to correct all their barrier culverts on the list by the end of October 2016. It

ordered WSDOT to correct many of its barrier culverts within seventeen years, and to correct the remainder only at the end of the culverts' natural life or in connection with independently undertaken highway projects. We provide a more detailed description of the injunction below.

## IV.  Standard of Review

We review de novo dismissals for want of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *Rhoades v. Avon Products*, *Inc*., 504 F.3d 1151, 1156 (9th Cir. 2007). We also review de novo a grant or denial of summary judgment. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 652 (9th Cir. 2002). We review permanent injunctions under three standards:  we review factual findings for clear error, legal conclusions de novo, and the scope of the injunction for abuse of discretion. *Id*. at 653.

## V.  Discussion

Washington objects to the decision of the district court on a number of grounds. It objects to the court's interpretation of the Stevens Treaties, contending that it has no treaty-based duty to refrain from building and maintaining barrier culverts; to the overruling of its waiver defense; to the dismissal of its cross-request against the United States; and to the injunction. We take the State's objections in turn.

## A.  Washington's Duty under the Treaties

The fishing clause of the Stevens Treaties guarantees to the Tribes a right to engage in off-reservation fishing. It provides, in its entirety:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however*, That they shall not take shell fish from any beds staked or cultivated by citizens.

*Fishing Vessel*, 443 U.S. at 674 (emphasis in original). Washington concedes that the clause guarantees to the Tribes the right to take up to fifty percent of the fish available for harvest, but it contends that the clause imposes no obligation on the State to ensure that any fish will, in fact, be available.

In its brief to us, Washington denies any treaty-based duty to avoid blocking salmon-bearing streams:

> [T]he Tribes here argue for a treaty right that finds no basis in the plain language or historical interpretation of the treaties. On its face, the right of taking fish in common with all citizens does not include a right to prevent the State from making land use decisions that could incidentally impact fish. Rather, such an interpretation is contrary to the treaties' principal purpose of opening up the region to settlement.

Brief at 27–28. At oral argument, Washington even more forthrightly denied any treaty-based duty. Washington

contended that it has the right, consistent with the Treaties, to block every salmon-bearing stream feeding into Puget Sound:

> The Court: Would the State have the right, consistent with the treaty, to dam every salmon stream into Puget Sound?
>
> Answer: Your honor, we would never and could never do that. . . .
>
> The Court:  . . . I'm asking a different question.  Would you have the right to do that under the treaty?
>
> Answer: Your honor, the treaty would not prohibit that[.]
>
> The Court:  So, let me make sure I understand your answer.  You're saying, consistent with the treaties that Governor Stevens entered into with the Tribes, you could block every salmon stream in the Sound?
>
> Answer: Your honor, the treaties would not prohibit that[.]

Oral Argument at 1:07–1:45, October 16, 2015.

The State misconstrues the Treaties.

We have long construed treaties between the United States and Indian tribes in favor of the Indians.  Chief Justice Marshall wrote in the third case of the Marshall Trilogy, "The language used in treaties with the Indians should never be

construed to their prejudice." *Worcester v. Georgia*, 31 U.S. 515, 582 (1832). "If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." *Id.*

Negotiations for the Stevens Treaties were conducted in the Chinook language, a trading jargon of only about 300 words. *Fishing Vessel*, 443 U.S. at 667 n.10. The Treaties were written in English, a language the Indians could neither read nor write. Because treaty negotiations with Indians were conducted by "representatives skilled in diplomacy," because negotiators representing the United States were "assisted by . . . interpreter[s] employed by themselves," because the treaties were "drawn up by [the negotiators] and in their own language," and because the "only knowledge of the terms in which the treaty is framed is that imparted to [the Indians] by the interpreter employed by the United States," a "treaty must . . . be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Jones v. Meehan*, 175 U.S. 1, 11 (1899). "[W]e will construe a treaty with the Indians as [they] understood it, and as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection, and counterpoise the inequality by the superior justice which looks only to the substance of the right, without regard to technical rules." *United States v. Winans*, 198 U.S. 371, 380 (1905) (internal quotation marks omitted). "[W]e look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999) (internal quotation marks omitted).

The Supreme Court has interpreted the Stevens Treaties on several occasions.  In affirming Judge Boldt's decision, the Court wrote:

> [I]t is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule.  It has held that the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side.  "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Jones v. Meehan*, 175 U.S. 1, 11.  This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor. *Tulee v. Washington*, 315 U.S. 681 [1947]; *Seufort Bros. Co. v. United States*, 249 U.S. 194 [1919]; *United States v. Winans*, 198 U.S. 371 [1905].  *See also Washington v. Yakima Indian Nation*, 439 U.S. 463, 484 [1979].

*Fishing Vessel*, 443 U.S. at 675–76.

Washington has a remarkably one-sided view of the Treaties.  In its brief, Washington characterizes the "treaties' principal purpose" as "opening up the region to settlement."

Brief at 29.  Opening up the Northwest for white settlement was indeed the principal purpose of the United States.  But it was most certainly not the principal purpose of the Indians. Their principal purpose was to secure a means of supporting themselves once the Treaties took effect.

Salmon were a central concern.  An adequate supply of salmon was "not much less necessary to the existence of the Indians than the atmosphere they breathed."  *Winans*, 198 U.S. at 381.  Richard White, an expert on the history of the American West and Professor of American History at Stanford University, wrote in a declaration filed in the district court that, during the negotiations for the Point-No-Point Treaty, a Skokomish Indian worried aloud about "how they were to feed themselves once they ceded so much land to the whites."  Professor White wrote, to the same effect, that during negotiations at Neah Bay, Makah Indians "raised questions about the role that fisheries were to play in their future."  In response to these concerns, Governor Stevens repeatedly assured the Indians that there always would be an adequate supply of fish.  Professor White wrote that Stevens told the Indians during negotiations for the Point Elliott Treaty, "I want that you shall not have simply food and drink now but that you may have them forever."  During negotiations for the Point-No-Point Treaty, Stevens said, "This paper is such as a man would give to his children and I will tell you why.  This paper gives you a home.  Does not a father give his children a home? . . . This paper secures your fish.  Does not a father give food to his children?"  *Fishing Vessel*, 443 U.S. at 667 n.11 (ellipsis in original).

The Indians did not understand the Treaties to promise that they would have access to their usual and accustomed fishing places, but with a qualification that would allow the

government to diminish or destroy the fish runs. Governor Stevens did not make, and the Indians did not understand him to make, such a cynical and disingenuous promise. The Indians reasonably understood Governor Stevens to promise not only that they would have access to their usual and accustomed fishing places, but also that there would be fish sufficient to sustain them. They reasonably understood that they would have, in Stevens' words, "food and drink . . . forever." As the Supreme Court wrote in *Fishing Vessels*:

> Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would *protect that source of food and commerce* were crucial in obtaining the Indians' assent. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter should be excluded from their ancient fisheries, and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any *meaningful use* of their accustomed places to fish.

*Id.* at 676–77 (citations and internal quotation marks omitted) (emphases added).

Even if Governor Stevens had not explicitly promised that "this paper secures your fish," and that there would be food "forever," we would infer such a promise. In *Winters v.*

*United States*, 207 U.S. 564 (1908), the treaty creating the Fort Belknap Reservation in Montana did not include an explicit reservation of water for use on the reserved lands, but the Supreme Court inferred a reservation of water sufficient to support the tribe. The purpose of the treaty was to reserve land on which the Indians could become farmers. Without a reservation of water, the "lands were arid, and . . . practically valueless." *Id.* at 576. "[B]etween two inferences, one of which would support the purpose of the agreement and the other impair or defeat it," the Court chose the former. *Id.* at 577.

Similarly, in *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), the Klamath Tribe in Oregon had entered into an 1854 treaty under which it relinquished 12 million acres, reserving for itself approximately 800,000 acres. The treaty promised that the tribe would have the right to "hunt, fish, and gather on their reservation," *id.* at 1398, but contained no explicit reservation of water rights. A prime hunting and fishing area on the reservation was the Klamath Marsh, whose suitability for hunting and fishing depended on a flow of water from the Williamson River. A primary purpose of the treaty was to "secure to the Tribe a continuation of its traditional hunting and fishing" way of living. *Id.* at 1409. Because game and fish at the Klamath Marsh depended on a continual flow of water, the treaty's purpose would have been defeated without that flow. In order to "support the purpose of the agreement," *Winters*, 207 U.S. at 577, we inferred a promise of water sufficient to ensure an adequate supply of game and fish. *Adair*, 723 F.2d at 1411.

Thus, even if Governor Stevens had made no explicit promise, we would infer, as in *Winters* and *Adair*, a promise to "support the purpose" of the Treaties. That is, even in the

absence of an explicit promise, we would infer a promise that the number of fish would always be sufficient to provide a "moderate living" to the Tribes. *Fishing Vessel*, 443 U.S. at 686. Just as the land on the Belknap Reservation would have been worthless without water to irrigate the arid land, and just as the right to hunt and fish on the Klamath Marsh would have been worthless without water to provide habitat for game and fish, the Tribes' right of access to their usual and accustomed fishing places would be worthless without harvestable fish.

In *Washington III*, we vacated the district court's declaration of a broad and undifferentiated obligation to prevent environmental degradation. We did not dispute that the State had environmental obligations, but, in the exercise of discretion under the Declaratory Judgment Act, we declined to sustain the sweeping declaratory judgment issued by the district court. We wrote, "The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case." *Washington III*, 759 F.2d at 1357.

We concluded:

> The State of Washington is bound by the treaty. If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts.

> In other instances, the measure of the State's obligation will depend for its precise legal formulation on all of the facts presented by a particular dispute.

*Id*. There is no allegation in this case that in building and maintaining its barrier culverts the State has acted "for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty." The consequence of building and maintaining the barrier culverts has been to diminish the supply of fish, but this consequence was not the State's "primary purpose or object." The "measure of the State's obligation" therefore depends "on all the facts presented" in the "particular dispute" now before us.

The facts presented in the district court establish that Washington has acted affirmatively to build and maintain barrier culverts under its roads. The State's barrier culverts within the Case Area block approximately 1,000 linear miles of streams suitable for salmon habitat, comprising almost 5 million square meters. If these culverts were replaced or modified to allow free passage of fish, several hundred thousand additional mature salmon would be produced every year. Many of these mature salmon would be available to the Tribes for harvest.

Salmon now available for harvest are not sufficient to provide a "moderate living" to the Tribes. *Fishing Vessel*, 443 U.S. at 686. The district court found that "[t]he reduced abundance of salmon and the consequent reduction in tribal harvests has damaged tribal economies, has left individual tribal members unable to earn a living by fishing, and has caused cultural and social harm to the Tribes in addition to the economic harm." The court found, further, that "[m]any

members of the Tribes would engage in more commercial and subsistence salmon fisheries if more fish were available."

We therefore conclude that in building and maintaining barrier culverts within the Case Area, Washington has violated, and is continuing to violate, its obligation to the Tribes under the Treaties.

## B.  Waiver by the United States

In the district court, Washington asserted a defense of "waiver and/or estoppel" based on action and inaction by the United States that, according to Washington, led the State to believe that its barrier culverts did not violate the Treaties. On appeal, Washington has dropped its estoppel argument, pressing only its waiver argument.

Washington alleged in the district court that WSDNR had developed, in consultation with the United States, a 1999 "Forest and Fish Report" that contemplated a fifteen-year schedule for "remediation of fish problems on forest roads" under the control of WSDNR.  Washington alleged that it "reasonably concluded that by approving or failing to object to the State's 15-year remediation schedule for forest roads, the NMFS [National Marine Fisheries Service] had determined that the schedule satisfied any treaty obligation." Washington also alleged, with respect to "many" of the culverts under the control of WSDOT, that the culverts are "in highways funded in part by the United States," and that "[t]hese highways were designed according to standards set or approved by the Federal Highway Administration (FHWA) and its predecessors."  Washington alleged that it "reasonably concluded that by approving or failing to object to the State's culvert design and maintenance, the FHWA had determined

that the design and maintenance satisfied any treaty obligation." Washington further alleged that the Army Corps of Engineers, in administering the Clean Water Act, and the NMFS and U.S. Fish & Wildlife Service, in administering the Endangered Species Act, issued permits to, or failed to object to, WSDOT culverts, and that Washington reasonably relied on their action and inaction to conclude that it had satisfied any treaty obligations.

The United States may abrogate treaties with Indian tribes, just as it may abrogate treaties with fully sovereign nations. However, it may abrogate a treaty with an Indian tribe only by an Act of Congress that "clearly express[es an] intent to do so." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). Congress has not abrogated the Stevens Treaties. So long as this is so, the Tribes' rights under the fishing clause remain valid and enforceable. The United States, as trustee for the Tribes, may bring suit on their behalf to enforce the Tribes' rights, but the rights belong to the Tribes.

The United States cannot, based on laches or estoppel, diminish or render unenforceable otherwise valid Indian treaty rights. *See, e.g.*, *Cramer v. United States*, 261 U.S. 219, 234 (1923) (where Indians had treaty rights to land, leasing of the land to a non-Indian defendant "by agents of the government was . . . unauthorized and could not bind the government; much less could it deprive the Indians of their rights"); *United States v. Washington*, 157 F.3d 630, 649 (9th Cir. 1998) ("[L]aches or estoppel is not available to defeat Indian treaty rights.") (quoting *Swim v. Bergland*, 696 F.2d 712, 718 (9th Cir. 1983)); and *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 334 (9th Cir. 1956) ("No defense of laches or estoppel is available to the defendants

here for the Government[,] as trustee for the Indian Tribe, is not subject to those defenses."). The same is true for waiver. Because the treaty rights belong to the Tribes rather than the United States, it is not the prerogative of the United States to waive them.

Washington argues the above line of cases has been "called in doubt" by *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005). Brief at 42. We disagree. Suit was brought in *Sherrill* by the Oneida Indian Nation ("OIN"), whose lands once comprised six million acres in central New York State. In 1788, in the Treaty of Fort Schuyler, OIN reserved 300,000 acres of its tribal land and ceded the rest to New York. Two years later, Congress passed the Indians Trade and Intercourse Act (the "Nonintercourse Act"), which required federal approval for the sale of tribal land. New York largely ignored the law and in the following years obtained large quantities of tribal land through treaties with OIN. The United States did little to stop these transactions; indeed, its agents took an active role in encouraging Oneidas to move west. By 1838, Oneidas had sold all but 5,000 acres of their reserved lands. By 1920, their ownership had dwindled to 32 acres.

In 1985, the Supreme Court held that the sale of OIN lands had been unlawful, and that the OIN was entitled to monetary compensation for these sales. *See Cnty. of Oneida v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226 (1985). In 1997 and 1998, OIN purchased on the open market two parcels of land, located within the boundaries of its ancestral reservation, that had been sold to a non-Indian in 1807. OIN claimed tribal sovereign status for the purchased parcels, including the sovereign right to be free of local property taxes. In *Sherrill*, the Court held against OIN, writing that

"the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue."  544 U.S. at 203.

The case before us is radically different from *Sherrill*. The question in our case is not whether, as in *Sherrill*, a tribe has sovereignty over land within the boundaries of an abandoned reservation.  The Tribes have not abandoned their reservations.  Nor is the question whether, as in *Sherrill*, the Tribes have acted to relinquish their rights under the Treaties. The Tribes have done nothing to authorize the State to construct and maintain barrier culverts.  Nor, finally, is the question whether, as in *Sherrill*, to allow the revival of disputes or claims that have long been left dormant.  As described above, Washington and the Tribes have been in a more or less continuous state of conflict over treaty-based fishing rights for over one hundred years.

## C.  Washington's Cross-Request

### 1.  Injunction

Washington asserted a "cross-request" (in effect, a counterclaim) based on the United States' construction and maintenance of barrier culverts on its own land.  Washington contended that if its barrier culverts violate the Treaties, so too do the United States' barrier culverts.  Washington contended that an injunction requiring it to correct its barrier culverts, while leaving undisturbed those of the United States, imposed a disproportionate and therefore unfair burden on the State.  Washington sought an injunction that would require the United States "to fix and thereafter maintain all culverts built or maintained by [the United States] . . . before the State

of Washington is required to repair or remove any of its culverts."

The district court struck the cross-request for an injunction and subsequently denied Washington's motion to amend. It did so on two grounds. First, it held that Washington's cross-request was barred by sovereign immunity. Second, it held that Washington did not have standing to assert treaty rights belonging to the Tribes. We agree with both grounds.

### a. Sovereign Immunity

The United States enjoys sovereign immunity from unconsented suits. However, when the United States files suit, consent to counterclaims seeking offset or recoupment will be inferred. *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970). Washington contends that the injunction it seeks against the United States is "recoupment." We disagree.

The Tenth Circuit has set forth three criteria that must be satisfied for a recoupment claim:

> To constitute a claim in recoupment, a defendant's claim must (1) arise from the same transaction or occurrence as the plaintiff's suit; (2) seek relief of the same kind or nature as the plaintiff's suit; and (3) seek an amount not in excess of the plaintiff's claim.

*Berrey v. Asarco Inc.*, 439 F.3d 636, 645 (10th Cir. 2006); *see Fed. Deposit Insur. Corp. v. Hulsey*, 22 F.3d 1472, 1487 (10th Cir. 1994). We adopt these criteria as our own, and

make explicit that the remedy (the "amount") sought by the United States and by the defendant in recoupment must be monetary.

It is implicit in the use of the word "amount" in *Berrey*'s third criterion that a recoupment claim is a monetary claim. A claim for recoupment, if successful, can reduce or eliminate the amount of money that would otherwise be awarded to the plaintiff. It cannot result in an affirmative monetary judgment in favor of the party asserting the claim: "Although a counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery, no affirmative relief may be given against a sovereign in the absence of consent." *Agnew*, 423 F.2d at 514; *see also United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 511 (1940) ("[A] defendant may, without statutory authority, recoup on a counterclaim an amount equal to the principal claim."); *Black's Law Dictionary* 1466 (10th ed. 2009) ("Recoupment: 1. The getting back or regaining of something, esp. expenses. 2. The withholding, for equitable reasons, of all or part of something that is due. . . . 3. Reduction of a plaintiff's damages because of a demand by the defendant arising out of the same transaction. . . . 4. The right of a defendant to have the plaintiff's claim reduced or eliminated because of the plaintiff's breach of contract or duty in the same transaction."). The parties have cited no case, and we have found none, in which the term recoupment has been applied to non-monetary relief such as an injunction.

Washington's cross-request for an injunction thus does not qualify as a claim for recoupment and is barred by sovereign immunity.

b.  Standing

Washington seeks an injunction requiring the United States to correct its barrier culverts on the ground that the United States is bound by the Treaties in the same manner and to the same degree as the State.  Washington is, of course, correct that the United States is bound by the Treaties. Indian treaty rights were "intended to be continuing against the United States . . . as well as against the state[.]"  *Winans*, 198 U.S. at 381–82.  Our holding that Washington has violated the Treaties in building and maintaining its barrier culverts necessarily means that the United States has also violated the Treaties in building and maintaining its own barrier culverts.

However, any violation of the Treaties by the United States violates rights held by the Tribes rather than the State. The Tribes have not sought redress against the United States in the proceeding now before us.

2.  Recoupment of Part of Washington's Costs

In its Petition for Panel Rehearing and for Rehearing En Banc, filed after our opinion came down, *see United States v. Washington*, 827 F.3d 836 (9th Cir. 2016), Washington contends that we misconstrued its appeal of the district court's denial of its cross-request.  Washington writes in its Petition:

> The State's original [cross-request] sought a variety of remedies, including that the federal government be required to (1) pay part of the cost of replacing state culverts that were designed to federal standards; (2) take

actions on federal lands to restore salmon runs; and (3) replace federal culverts in Washington. But on appeal, the State pursued only the first of these remedies.

We did not, and do not, so understand the State's appeal. Contrary to Washington's statement, it did appeal the district court's denial of its cross-request for an injunction requiring the United States to repair or replace the United States' own barrier culverts. It did not appeal a denial of a request that the United States be required to pay part of its costs to repair or replace its culverts.

In the district court, Washington stated in the body of its cross-request that "[t]he United States has a duty to pay all costs incurred by the State to identify and fix any and all barrier culverts." But in its demand for relief, Washington did not demand any monetary payment from the United States, unless its boilerplate request ("The State of Washington further requests all other relief the Court deems just and equitable") could be deemed such a demand. Not surprisingly, in denying Washington's cross-request, the district court did not discuss a demand for monetary payment from the United States. In its brief to us, Washington writes in the introduction that the district court erred in denying its request to allow the State "to recoup some of the costs of compliance from the United States because it specified the culvert design and caused much of the decline in the salmon runs." But Washington makes no argument in the body of its brief that it should be allowed to recover from the United States any part of the cost to repair or replace its own barrier culverts.

When considering Washington's appeal, we did not understand it to argue that it should have been awarded, as recoupment or set-off, a monetary award from the United States. Given Washington's failure to make this argument in the body of its brief, the argument was waived. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). However, given the vigor with which Washington now makes the argument in its Petition for Rehearing and Rehearing En Banc, we think it appropriate to respond on the merits.

Washington's argument is easily rejected. As recounted above, a claim for recoupment must, *inter alia*, "seek relief of the same kind or nature as the plaintiff's suit." *Berrey*, 439 F.3d at 645. Washington's claim does not satisfy this criterion. The United States, the plaintiff, sought injunctive relief against Washington. Washington sought a monetary award. These two forms of relief are not "of the same kind or nature."

## D. Injunction

The district court held a trial in 2009 and 2010 to determine the appropriate remedy for Washington's violation of the Treaties. At the time of trial, there were 1,114 state-owned culverts in the Case Area. At least 886 of them blocked access to "significant habitat," defined as 200 linear meters or more of salmon habitat upstream from the culvert to the first natural passage barrier. More barrier culverts were identified or constructed within the Case Area after 2009. The court estimated in its 2013 Memorandum and Decision that at the then-current rate of remediation, all of the barrier culverts under the control of WSDNR, State Parks, and WDFW would be corrected by October 31, 2016. The great majority of barrier culverts, however, were under WSDOT's

control.  In 2009, when trial began, there were 807 identified WSDOT barrier culverts.  Additional WSDOT barrier culverts were constructed or identified after that date.

In 1997, WDFW and WSDOT reported to the Washington State legislature that WSDOT culverts blocked 249 linear miles of stream, comprising over 1.6 million square meters of salmon habitat, which they estimated was sufficient to produce 200,000 adult salmon per year.  Based on WDFW records, the district court found that at the time of trial, state-owned barrier culverts in the Case Area blocked access to approximately 1,000 miles of stream, comprising almost 5 million square meters of salmon habitat.

The district court issued a permanent injunction in 2013, on the same day it issued its Memorandum and Decision. The court ordered the State, in consultation with the Tribes and the United States, to prepare within six months a current list of all state-owned barrier culverts within the Case Area. The court ordered that identification of a culvert as a "barrier" be based on the methodology specified in the Fish Passage Barrier and Surface Water Diversion Screening and Prioritization Manual ("Assessment Manual") published by WDFW in 2000.  The court ordered WSDNR, State Parks, and WDFW to provide fish passage through all their barrier culverts on the list by October 31, 2016 — the date by which these three agencies were already expected to complete correction of their barrier culverts.

For barrier culverts under the control of WSDOT, the injunction was more nuanced.  In Paragraph 6 of the injunction, the court ordered WSDOT to provide, within seventeen years of the date of the order, and "in accordance with the standards set out in this injunction," fish passage for

each barrier culvert with more than 200 linear meters of salmon habitat upstream to the first natural passage barrier. In Paragraph 7, the court ordered WSDOT to replace existing barrier culverts above which there was less than 200 linear meters of accessible salmon habitat only at the "end of the useful life" of the culverts, or sooner "as part of a highway project." In Paragraph 8, the court allowed WSDOT to defer correction of some of the culverts described in Paragraph 6. Deferred culverts can account for up to ten percent of upstream habitat from the culverts described in Paragraph 6. WSDOT's choice of which culverts to defer is to be made in consultation with the Tribes and the United States. The court specified that the choice of culverts could be guided by the "Priority Index" methodology described in the WDFD Assessment Manual. That methodology uses cost as a permissible factor in determining priority. Assessment Manual at 55. Culverts deferred under Paragraph 8 are to be replaced on the more lenient schedule specified in Paragraph 7.

In Paragraph 9, the district court ordered that the State

> shall design and build fish passage at each barrier culvert on the List in order to pass all species of salmon at all life stages at all flows where the fish would naturally seek passage. In order of preference, fish passage shall be achieved by (a) avoiding the necessity for the roadway to cross the stream, (b) use of full span bridge, (c) use of the "stream simulation" methodology . . . which the parties to this proceeding have agreed represents the best science currently available for designing culverts that provide fish

passage and allow fluvial processes. Nothing in this injunction shall prevent the [State] from developing and using designs other than bridges or stream simulation in the future if the [State] can demonstrate that those future designs provide equivalent or better fish passage and fisheries habitat benefits than the designs required in this injunction.

In Paragraph 10, the court provided that the State may deviate from the design standards specified in Paragraph 9 in cases of emergency or where "extraordinary site conditions" exist. The court specified that it would "retain continuing jurisdiction . . . for a sufficient period to assure that the [State] compl[ies] with the terms of this injunction."

Washington declined to participate in the formulation of the injunction on the ground that it had not violated the Treaties and that, therefore, no remedy was appropriate. Washington now objects on several grounds to the injunction that was formulated without its participation. Washington specifically objects (1) that the injunction is too "broad," Brief at 50; (2) that the district court did not "defer to the State's expertise," *id.* at 54; (3) that the court did not properly consider costs and equitable principles, *id.* at 57; (4) and that the injunction "impermissibly and significantly intrudes into state government operations." *Id.* at 63. Finally, Washington objects that its four specific objections support a contention that the court's injunction is inconsistent with "federalism principles." *Id.* at 47, 65. We consider the State's objections in turn.

### 1. Breadth of the Injunction

Washington contends in its brief that "[t]he Tribes *presented no evidence* that state-owned culverts are a significant cause of the decline [in salmon]. . . . Despite that *complete failure of proof*, the district court found that state-owned culverts 'have a significant total impact on salmon production.'" Brief at 50 (emphasis in original). Washington contends, further, that the district court "ordered replacement of nearly every state-owned barrier culvert within the case area without any specific showing that those culverts have significantly diminished fish runs or tribal fisheries, or that replacing them will meaningfully improve runs." *Id.*

Washington misrepresents the evidence and mischaracterizes the district court's order.

Contrary to the State's contention, the Tribes presented extensive evidence in support of the court's conclusion that state-owned barrier culverts have a significant adverse effect on salmon. The 1997 report prepared for the Washington State Legislature by two of the defendants in this case, WDFW and WSDOT, stated, "Fish passage at human made barriers such as road culverts is one of the most recurrent and correctable obstacles to healthy salmonid stocks in Washington." The report concluded:

> A total potential spawning and rearing area of 1,619,839 $m^2$ (249 linear miles) is currently blocked by WSDOT culverts on the 177 surveyed streams requiring barrier resolution; this is enough wetted stream area to produce 200,000 adult salmonid annually. These estimates would all increase when considering

the additional 186 barriers that did not have full habitat assessments.

The report recommended that state funding be supplied to remove "all barriers" under the control of the State:

Planning is underway for resolution of at least seven more barriers during the 1997–99 biennium using dedicated funds, and to resolve all barriers in the next two or three decades. . . . Estimated cost is about $40 million, with resultant benefits exceeding $160 million.

Based on later WDFW figures, the district court found that at the time of trial state-owned barrier culverts in the Case Area blocked access to approximately 1,000 linear miles of stream, comprising almost 5 million square meters of salmon habitat. These figures, taken together with the 1997 figures supplied by WDFW and WSDOT, indicate that the total habitat blocked by state-owned barrier culverts in the Case Area is capable of producing several times the 200,000 mature salmon specified in the 1997 report.

The State contends that because of the presence of non-state-owned barrier culverts on the same streams as state-owned barrier culverts, the benefit obtained from remediation of state-owned culverts will be insufficient to justify the district court's injunction. The State writes:

[S]tate-owned culverts are less than 25% of all known barrier culverts, and in some places, non-state culverts outnumber state-owned culverts by a factor of 36 to 1. Any benefit

from fixing a state-owned culvert will not be
realized if fish are blocked by other culverts
in the same stream system.

There are several answers to the State's contention.  First,
it is true that in calculating whether a state culvert is a barrier
culvert, and in determining the priority for requiring
remediation, the court's injunction ignores non-state barriers
on the same stream.  But in so doing, the court followed the
practice of the state itself.  Paul Sekulich, formerly division
manager in the restoration division in the habitat program of
the Washington Department of Fish and Wildlife ("WDFW"),
testified in the district court:

> Q: When you calculate a priority index
> number for a [state-owned] culvert, do you
> account for the presence of other fish passage
> barriers in a watershed?
>
> A: . . . When the priority index is calculated,
> it treats those other barriers as transparent.
> The reason we do that, we don't know when
> those other barriers are being corrected.  So
> by treating them as transparent, you do a
> priority index that looks at potential habitat
> gain as if all those barriers would be corrected
> at some point in time.

Washington State law requires that a "dam or other
obstruction across or in a stream" be constructed in such a
manner as to provide a "durable and efficient fishway"
allowing passage of salmon.     Wash. Rev. Code
§ 77.57.030(1).  If owners fail to construct or maintain proper

fishways, the Director of WDFW may require them do so at their own expense. *Id.* at § 77.57.030(2).

Second, in 2009, on streams where there were both state and non-state barriers, 1,370 of the 1,590 non-state barriers, or almost ninety percent, were upstream of the state barrier culverts. Sixty nine percent of the 220 downstream non-state barriers allowed partial passage of fish. Of the 152 that allowed partial passage, "passability" was 67% for 80 of the barriers and 33% for 72 of them.

Third, the specific example provided by the state is a culvert on the Middle Fork of Wildcat Creek under State Route 8 in Grays Harbor County. The State is correct that there are 36 non-state barriers and only one state barrier culvert on this creek. The State fails to mention, however, that all of the non-state barriers are upstream of the state culvert. Further, it is apparent from the map in the district court record that the nearest non-state barrier is almost a half mile upstream.

Witnesses at trial repeatedly described benefits to salmon resulting from correction of barrier culverts. One example is evidence presented by Mike McHenry, habitat program manager for the Lower Elwha Klallam Tribe. In his written testimony, McHenry described several studies. One was a 2003 study of culvert removal projects on the Stillaguamish River that opened up 19 linear kilometers of salmon habitat. According to the study, over 250 adult coho salmon were observed spawning in the newly accessible habitat in each of the two years immediately after the completion of the projects. Based on his own experience as habitat manager for the tribe, McHenry wrote that removal of barrier culverts on the Lower Elwha River had had a similar effect. In

McHenry's view, "The systematic correction of barrier culverts is an important place to focus restoration efforts." He wrote, further, "The correction of human caused barriers is generally recognized as the second highest priority for restoring habitats used by Pacific salmon (following the protection of existing functional habitats)."

In his live testimony, McHenry stated that his tribe had corrected seventeen of thirty-one barriers in a particular watershed:

> McHenry: Because when we did the watershed assessment, we found that there were 50 miles of historically active stream that salmon could access in this watershed, and fully half that mileage was blocked by culverts of various ownerships. So to us, we applied our scientific knowledge and recommendations from the literature which indicated that when you're going to restore a place like this, you need to go after the barriers first.

> The Court: In your expert opinion, that was the biggest bang for your buck?

> McHenry: Yes.

Another example is the live testimony of Lawrence Wasserman, environmental policy manager for the Swinomish Indian Tribal Community. He testified that culvert remediation provides substantial benefits:

There's an immediate access and immediate benefit to additional habitat when we replace a culvert . . . .

If you compare that to having to plant trees, shade, it can take 10, 20, 50 years to get the trees large enough . . . .

. . . We have a high confidence in design. By and large, we know how to fix culverts. . . . So we have a high confidence compared to many other more experimental restoration activities.

It's fairly easy to monitor.  If there were no fish there before, [then] we open a culvert and we can count fish[.] . . .

A critical factor is that there's minimal impacts on adjacent land use or land owners. . . . [I]t's relatively infrequent where there needs to be a condemnation of other people's land or asking people to sell their land. . . .

. . . It's cost effective.  There have been some studies that have shown that, really, compared to other kinds of restoration activities, the cost per smolt produced is relatively low[.] . . .

And finally, we get benefits with a broad sweep of culvert repairs.  We get a very broad geographic distribution of benefits, and the

cumulative effects can accrue across a variety
of watersheds.

It is true, as the evidence at trial showed, that correction
of barrier culverts is only one of a number of measures that
can usefully be taken to increase salmon production in the
Case Area. It is also true that the benefits of culvert
correction differ depending on the culvert in question. For
example, Paul Wagner, manager of the culvert correction
program for WSDOT, presented evidence in 2013 identifying
817 WSDOT barrier culverts blocking 937 linear miles of
stream habitat in the Case Area. Wagner's evidence showed
that correction of the 314 culverts blocking the most habitat
would open up 655 of the 937 miles of total habitat.
Correcting the 232 culverts blocking the least habitat would
open up only 95 miles. Those 95 miles of habitat constitute
10.1 percent of the total habitat blocked by the 817 barrier
culverts. The 232 culverts blocking those 95 miles
constituted 28.4 percent of the total barrier culverts.

The district court's injunction took into account the facts
that culvert correction is not the only factor in salmon
recovery; that some culverts block more habitat than others;
and that some culverts are more expensive to correct than
others. The court ordered correction of high-priority culverts
— those blocking 200 linear meters or more of upstream
habitat — within seventeen years. For low-priority culverts
— those blocking less than 200 linear meters of upstream
habitat — the court ordered correction only at the end of the
useful life of the existing culvert, or when an independently
undertaken highway project would require replacement of the
culvert. Further, recognizing the likelihood that accelerated
replacement of some high-priority culverts will not be cost-
effective, the court allowed the State to defer correction of

high-priority culverts accounting for up to ten percent of the total blocked upstream habitat, and to correct those culverts on the more lenient schedule of the low-priority culverts. Wagner's evidence indicates that if the sole criterion for choosing deferred culverts is the amount of blocked habitat, there will be approximately 230 deferred culverts. If cost of correction of particular culverts is added as a criterion, there will be a somewhat smaller number of deferred culverts.

In sum, we disagree with Washington's contention that the Tribes "presented no evidence," and that there was a "complete failure of proof," that state-owned barrier culverts have a substantial adverse effect on salmon. The record contains extensive evidence, much of it from the State itself, that the State's barrier culverts have such an effect. We also disagree with Washington's contention that the court ordered correction of "nearly every state-owned barrier culvert" without "any specific showing" that such correction will "meaningfully improve runs." The State's own evidence shows that hundreds of thousands of adult salmon will be produced by opening up the salmon habitat that is currently blocked by the State's barrier culverts. Finally, we disagree with Washington's contention that the court's injunction indiscriminately orders correction of "nearly every state-owned barrier culvert" in the Case Area. The court's order carefully distinguishes between high- and low-priority culverts based on the amount of upstream habitat culvert correction will open up. The order then allows for a further distinction, to be drawn by WSDOT in consultation with the United States and the Tribes, between those high-priority culverts that must be corrected within seventeen years and those that may be corrected on the more lenient schedule applicable to the low-priority culverts.

## 2. Deference to the State's Expertise

Washington contends that the district court made a clearly erroneous finding of fact, concluding that correction of human-caused barriers is the highest priority in habitat restoration. It contends, further, that this finding led the court to ignore the expert testimony presented by both the State and the Tribes. Washington wrote in its brief:

> The State has concluded — and the Tribes agree — that a comprehensive approach to preserving and restoring salmon runs is the most productive and cost-effective . . . . The district court concluded, however, that "correction of human-caused barriers is recognized as the highest priority for restoring salmon habitat in the Case Area." On that basis, the court ordered injunctive relief focused solely on culverts, even though the cost of the injunction will likely reduce funding available for other salmon restoration efforts. The court's finding was clearly erroneous, and its approach was an abuse of discretion.
>
> In concluding that fixing culverts is "the highest priority for restoring salmon habitat in the Case Area," the court cited the declaration of tribal expert Mike McHenry. Mr. McHenry said no such thing.

Brief at 54–55.

Washington is mistaken.  It is true that the district court made the factual finding to which Washington objects. Citing McHenry's evidence, the court wrote, "The correction of human-caused barriers is recognized as the highest priority for restoring salmon habitat in the Case Area."  But the court's finding is amply supported by the record.  With respect to restoring habitat (as distinct from *preserving* habitat, which has a higher priority), McHenry wrote that it is "generally recognized" that the correction of human-caused barriers is the highest priority.  Further, McHenry testified that "you need to go after the barriers first" because that is the "biggest bang for the buck."  Wasserman testified to the same effect, saying that "there's an immediate access and immediate benefit to additional habitat when we replace a culvert"; that "it's cost effective" compared to "other kinds of restoration activities"; and that "the cumulative effects can accrue across a variety of watersheds."

It is also true that the district court's injunction "focused solely on culverts" and did not order other remedies.  But it is appropriate that the injunction should have done so.  The court was acutely conscious of the fact that, while barrier culverts are an important cause of the decline of salmon in the Case Area, they are not the only cause.  It wrote, "*A primary cause* of this decline is habitat degradation . . . . *One cause* of the degradation of salmon habitat is blocked culverts[.]" (Emphasis added.)  However, because the only treaty violation alleged in this litigation was Washington's barrier culverts, the court acted appropriately in ordering only the correction of these culverts.  As the court wrote, "The scope of this subproceeding includes only those culverts that block fish passage under State-owned roads."

Contrary to Washington's contention, the district court had a sophisticated record-based understanding of the various causes of the decline of salmon in the Case Area, of what could be achieved by the correction of state-owned barrier culverts, and of the limitations on what could be achieved by culvert correction. The court's injunction is carefully crafted to reflect that understanding.

### 3. Costs and Equitable Principles

Washington contends that the district court's injunction fails properly to take costs into account, and that its injunction is inconsistent with equitable principles.

### a. Costs

Washington writes in its brief that correction of WSDOT barrier culverts will cost approximately $1.88 billion over the course of the seventeen-year schedule ordered by the court, or "roughly $117 million per year of the injunction." (Using Washington's own estimates, a correct calculation is actually $110.6 million per year rather than $117 million.) Washington's estimated total cost is based on an assumption of 817 corrected culverts, at an average correction cost of $2.3 million per culvert.

Washington's cost estimates are not supported by the evidence. Washington contended at trial, as it now contends to us, that the average cost to replace a WSDOT barrier culvert would be $2.3 million. But the district court did not accept this estimate. The court found that "the actual cost of construction for twelve WSDOT stream simulation culvert projects completed prior to the 2009 trial ranged from $413,000 to $1,674,411; the average cost for the twelve was

$658,639 each." In 2013, the State submitted a declaration from WSDOT official Wagner listing thirty-one culvert correction projects completed state-wide since October 2009. Of these, twenty-four used either a stream simulation design or a bridge. The declaration stated that the average cost for each these twenty-four projects was $1,827,168, not $2,300,000 as the State now contends. The district court noted that even Wagner's lower figure could not be confirmed because cost data was missing for eight of the twenty-four projects.

There are additional reasons to disregard the State's estimate of total cost. First, Washington assumes that all 817 of the state-owned barrier culverts will be corrected on the seventeen-year schedule. This is demonstrably incorrect. According to the State's own evidence, Paragraph 8 of the injunction will allow the State to defer correction of approximately 230 of the 817 culverts. If cost of barrier correction (rather than merely amount of upstream habitat) is taken into account in deciding which culverts to defer, fewer but more costly culverts will be deferred. Second, and perhaps more important, Washington must eventually correct its barrier culverts, irrespective of the court's order in this suit. The district court wrote that federal and state law require Washington to correct its barrier culverts "in any case," and that the only consequence of its order will be an "acceleration of barrier correction." The net costs imposed on Washington by the injunction are thus not the full costs of barrier correction, but rather only the "marginal costs attributable to an accelerated culvert correction schedule."

Finally, we note that a portion of WSDOT's funding for correcting its barrier culverts will come from the United States. The court wrote, "[T]he state expects to receive over

$22,000,000 for fish passage barrier projects from the federal government in the years 2011 to 2017. Of this amount, $15,813,000 is expected in the 2013–2015 biennium."

### b. Equitable Principles

Washington makes one specific objection based on equitable principles. It objects that the court abused its discretion in requiring that "the State alone," rather than State in conjunction with the United States, be "burdened with the entire cost of culvert repair." Brief at 63. We disagree. The court's order required correction of only those barrier culverts that were built and maintained by the State. It was not an abuse of discretion to require the State to pay for correction of its own barrier culverts.

Further, we note more generally that the district court did consider equitable principles, and concluded that those principles favored the Tribes and the citizens of the State. The court wrote:

> The Tribes and their individual members have been harmed economically, socially, educationally, and culturally by the greatly reduced salmon harvests that have resulted from State-created or State-maintained fish passage barriers.
>
> This injury is ongoing, as efforts by the State to correct the barrier culverts have been insufficient. . . . Remedies at law are inadequate as monetary damages will not adequately compensate the Tribes and their individual members for these harms. . . .

The balance of hardships tips steeply toward the Tribes in this matter. The promise made to the Tribes that the Stevens Treaties would protect their source of food and commerce was crucial in obtaining their assent to the Treaties' provisions. . . . Equity favors requiring the State of Washington to keep the promises upon which the Tribes relied when they ceded huge tracts of land by way of the Treaties.

. . .

The public interest will not be disserved by an injunction. To the contrary, it is in the public's interest, as well as the Tribes' to accelerate the pace of barrier correction. All fishermen, not just Tribal fishermen, will benefit from the increased production of salmon. . . . The general public will benefit from the enhancement of the resource and the increased economic return from fishing in the State of Washington. The general public will also benefit from the environmental benefits of salmon habitat restoration.

4. Intrusion into State Government Operations

Washington contends that the court's order "impermissibly and significantly intrudes into state government operations." Brief at 63. Washington contends that it "was making great strides in repairing culverts before any federal court intervention," and that "there was no need for the court to issue a detailed and expensive injunction that

sets an inflexible and tight schedule for culvert repair." *Id.* at 63–64. Washington implies that the cost of complying with the court's order will oblige the State to cut other important state programs:

> [T]he injunction will require the State to devote roughly $100 million per year more than it otherwise would have to culvert repair. This at a time when the State faces recurring budget shortfalls in the billions of dollars and has already made deep and painful cuts to subsidized health insurance for low income workers, K-12 schools, higher education, and basic aid for persons unable to work.

*Id.* at 58. We disagree.

The district court disagreed with Washington's contention that there was "no need" for the court to order correction of its barrier culverts. Based on the State's slow rate of barrier correction, the court concluded that "under the current State approach, the problem of WSDOT barrier culverts in the Case Area will never be solved." The district court also disagreed with the Washington's cost estimates. As seen above, Washington's estimate of its cost to comply with the court's order ("roughly $100 million per year" more than it would otherwise spend) is dramatically overstated.

The district court carefully considered the marginal cost imposed on Washington by its injunction and concluded that the State could comply with the order without cutting vital state programs. The court relied on a state budget document showing that $9.9 billion was allocated to the state transportation budget for the 2011–2013 biennium. Of that

$9.9 billion, $7.88 billion was allocated to WSDOT. Noting the separation of the transportation budget from other state budgets, the court concluded, "The separation of the Transportation Budget from the Operating and Capital Budgets ensures that money will not be taken from education, social services, or other vital State functions to fund culvert repairs."

### 5. Federalism Principles

Washington contends, based on the four specific objections just reviewed, that the district court's injunction violates principles of federalism. Washington asserts four principles of federalism:

> First, the remedy must be no broader than necessary to address the federal law violation. Second, courts must grant deference to a state's institutional competence and subject matter expertise. Third, courts must take cost into consideration and not substitute their budgetary judgment for that of the state. And finally, relief must be fashioned so that it is the least intrusive into state governmental affairs. The district court's injunction here contravenes all of these principles.

Blue Brief at 49. We will not quarrel here with these principles, stated at this level of generality. However, for the reasons given above, we have concluded that the district court's injunction violates none of them.

Further, a federalism-based objection to an injunction enforcing Indian treaty rights should not be viewed in the

same light as an objection to a more conventional structural injunction. Washington cites two Supreme Court cases in support of its federalism objection — *Rizzo v. Goode*, 423 U.S. 362 (1976) (structural injunction requiring reform of the Philadelphia police department), and *Horne v. Flores*, 557 U.S. 433 (2009) (structural injunctions requiring Arizona to comply with Equal Educational Opportunities Act of 1974). However, Washington fails to cite the Supreme Court case directly on point — *Fishing Vessel*, 443 U.S. 658 (1979) — in which the Court affirmed detailed injunctions requiring Washington to comply with the very Treaties at issue in this case.

The district court in *Fishing Vessel* had entered a series of detailed injunctions implementing its holding that the Treaties entitled the Tribes to take up to fifty percent of harvestable salmon in any given year. Washington strenuously resisted, with the result that the district court effectively took over much of the State's management of the salmon fishery. Washington objected both to the district court's interpretation of the Treaties, and to the court's intrusion into its affairs. The Supreme Court affirmed the district court's holding on the meaning of the Treaties. It then rejected, in no uncertain terms, federalism-based objections to the injunctions enforcing the Treaties:

> Whether [Washington] Game and Fisheries may be ordered actually to promulgate regulations having effect as a matter of state law may well be doubtful. But the District Court may prescind that problem by assuming direct supervision of the fisheries if state recalcitrance or state-law barriers should be continued. *It is therefore absurd to*

*argue . . . both that the state agencies may not be ordered to implement the decree and also that the District Court may not itself issue detailed remedial orders as a substitute for state supervision.*

*Fishing Vessel*, 443 U.S. at 695 (emphasis added).

### 6. Modification of the Injunction

It is possible that changing or newly revealed facts or circumstances will affect the fairness or efficacy of an injunction.  In the case before us, the district court has ordered that many of WSDOT's high-priority barrier culverts be corrected over the course of seventeen years, and that the remainder be corrected only at the end of the culvert's natural life or when road work undertaken for independent reasons would in any event require replacement of the culvert.  It is possible that, during this extended period, changed or newly revealed facts or circumstances will justify a modification of the injunction.  The district court should not hesitate to modify its injunction if this proves to be the case.  As the Supreme Court wrote in *System Federation No. 91 v. Wright*, 364 U.S. 642, 647 (1961), "a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."  *See also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380–81 (1992).  In affirming the judgment entered by the district court in this case, we emphasize that the flexibility inherent in equity jurisdiction allows the court, if changed or newly revealed facts or circumstances warrant, to modify its injunction accordingly.

Conclusion

In sum, we conclude that in building and maintaining barrier culverts Washington has violated, and continues to violate, its obligation to the Tribes under the fishing clause of the Treaties. The United States has not waived the rights of the Tribes under the Treaties, and has not waived its own sovereign immunity by bringing suit on behalf of the Tribes. The district court did not abuse its discretion in enjoining Washington to correct most of its high-priority barrier culverts within seventeen years, and to correct the remainder at the end of their natural life or in the course of a road construction project undertaken for independent reasons.

**AFFIRMED.**